State, ex rel. Thayer, v. Boyd.

STATE, EX REL. JOHN M. THAYER, V. JAMES E. BOYD.

[FILED MAY 5, 1891.]

1. **Governor:** QUO WARRANTO: SUPREME COURT: JURISDICTION. The supreme court has jurisdiction to entertain proceedings by information in the nature of *quo warranto,* instituted for the purpose of determining the rights of persons claiming the office of governor.

2. ————: ELIGIBILITY. Under the provisions of section 2, article V, of the constitution, no person is eligible to the office of governor who has not been a citizen of the United States and of this state for at least two years next preceding the election at which such officer is to be chosen.

3. **Elections:** WHEN VOID. Where a plurality of votes is cast for a person for a public office who is ineligible, the election is void.

4. **Naturalization:** CHILDREN OF ALIENS. Under the fourth section of the act of congress, entitled "An act to establish an uniform rule of naturalization," approved April 14, 1802, the child of an alien, under twenty-one years of age, although born in a foreign country, becomes a citizen by the naturalization of his parent, if dwelling within the United States at the time the parent is admitted to citizenship; but it does not have that effect if he is over twenty-one years old at the time the parent is naturalized.

5. ———: PROOF. The order of a court admitting an alien to citizenship is a judicial act, in the nature of a judgment, and can be proven only by the record.

6. Citizenship: USER. The fact that an alien has for many years voted at elections held in this state, and filled important public offices, does not establish that he is a citizen of the United States.

7. ———: DATES FROM ORDER OF COURT. Where an alien is naturalized under the naturalization laws, his citizenship dates from the time the order of the court is made admitting him to citizenship.

8. ———: NOT ACQUIRED BY ADMISSION OF STATE. The alien inhabitants of the territory of Nebraska at the time of its admission as a state, did not become citizens of the United States by virtue of the acts of congress admitting the state into the Union.

9. ———: CONSTITUTIONAL LAW: WORDS CONSTRUED. The words "citizen of the United States," as used in section 2 of article V of the state constitution, construed to mean a person who is an American citizen by birth, or a person of foreign birth who has been duly naturalized under the provisions of the uniform rule of naturalization established by congress.

10. Governor: TERM. Under section 1 of article V of the constitution, a person elected to the office of governor is entitled to discharge the duties and receive the emoluments of the office for the term of two years from the first Thursday after the first Tuesday in January following his election, and until a successor is duly elected and qualified.

11. ———: ———: INCUMBENT HOLDING OVER. Where the person receiving the highest number of votes for the office of governor is ineligible under the constitution to be elected, the governor holds over.

12. ———: SUCCESSION: LIEUTENANT GOVERNOR. The duties of the chief executive office of the state devolve upon the lieutenant governor in certain contingencies, among which are the failure of the governor elect to qualify, and disability of the governor. It cannot be said that there has been a failure to qualify, where no person has been constitutionally elected to the office.

13. ———: CONSTITUTIONAL LAW: WORDS CONSTRUED. The words "other disability of the governor," appearing in section 16, article V, of the constitution, have no reference to the ineli-

gibility of the person to be elected, but cover any disability of the governor, not specifically enumerated in the section, occurring after the commencement of his term of office.

14. **Elections:** FAILURE: INCUMBENT MUST REQUALIFY. *Held,* That when the non-election of a person to a public office is ascertained by proceedings in *quo warranto*, the person entitled to hold over must then requalify.

ORIGINAL proceeding in nature of *quo warranto*.

*John L. Webster, O. P. Mason,* and *Joseph H. Blair,* for relator:

The naturalization of Joseph Boyd, the father, in 1890 did not make respondent a citizen. (*Dryden v. Swinburne,* 20 W. Va., 89; *State v. Adriano,* 92 Mo., 70; *Gumm v. Hubbard,* 97 Id., 311; *State v. Penney,* 10 Ark., 621; *O'Connor v. State,* 9 Fla., 234; *U. S. v. Keller,* 13 Fed. Rep., 82; *Heney v. Brooklyn, etc., Soc.,* 39 N. Y., 333, 335-6.) He could not become a citizen by relation. (*In re Robert Desty,* 8 Abb. New Cases [N. Y.], 250; *Dryden v. Swinburne,* and *Heney v. Brooklyn, etc., Soc., supra.*) Respondent being ineligible, the election was void and no successor to John M. Thayer was elected. (*Dryden v. Swinburne, supra; Gulick v. New,* 14 Ind., 93–102; *State v. Swearingen,* 12 Ga., 23; *State v. Giles,* 1 Chand., 112; *State v. Smith,* 14 Wis., 497; *Saunders v. Haynes,* 13 Cal., 145; *State v. Gastinel,* 20 La. Ann., 114; McCrary, Elections, secs. 231–37; *Case of Albert Gallatin,* Cong. Globe, 2d Sess. 30th Cong., Appendix, 334; *Case of General Shields,* Id., 332; *In re Corliss,* 11 R. I., 638; *State v. Clark,* 3 Nev., 566; *State v. Sullivan,* 47 N. W. Rep., 802; *Saunders v. Haynes, supra;* "Eligible," 2 Cent. Dic.) For it cannot be said that the person voted for was elected and qualified, unless he had the legal requisites to qualify. (*Com. v. Hanley,* 9 Pa. St., 513; *State v. Jenkins,* 43 Mo., 261; *State v. Robinson,* 1 Kan., 25; *State v. Benedict,* 15 Minn., 153; *Saunders v. Haynes, supra.*) Unless the pre-requi-

sites of an election have been complied with, the lieutenant governor is not entitled to assume the office of governor, but John M. Thayer holds over. (*Goff v. Wilson*, 32 W. Va., 393; *Carr v. Wilson*, Id., 419; *Ex parte Lawhorne*, 18 Gratt. [Va.], 93; *State v. Lusk*, 18 Mo. 334; *State v. Sullivan, supra; People v. Bissell*, 49 Cal., 407; *People v. Osborne*, 7 Col., 605; *Tappan v. Gray*, 9 Paige [N. Y.], 511; *People v. Van Horne*, 18 Wend. [N. Y.], 518; *State v. Gray*, 23 Neb., 370; *Saunders v. Haynes, supra*.)   Sec. 1, art. V., of the constitution, providing that in case of non-election the incumbent shall hold over, is self-operating. (Cooley, Const. Lim. [5th Ed.], 78.)   Respondent cannot defend his possession on the ground that he is *de facto* governor; he must show a rightful title. (*Kimball v. Alcorn*, 45 Miss., 158; *Matthews v. Supervisors*, 53 Id., 715; *People v. Weber*, 89 Ill., 348; *People v. Weber*, 86 Id., 284; *Miller v. Callaway*, 32 Ark., 666; *Grace v. Teague*, 18 Atl. Rep., 289; *Morgan v. Vance*, 4 Bush [Ky.], 329; *Patterson v. Miller*, 2 Metc. [Ky.], 496; *Pearce v. Hawkins*, 2 Swan. [Tenn.], 88; *Boardman v. Halliday*, 10 Paige [N. Y.], 231; *People v. R. Co.*, 1 Lans. [N. Y.], 344; *Conover's Case*, 5 Abb. Pr. [N. Y.], 73.)   Voting and holding offices as alleged in the answer, did not make respondent a citizen. (*Dryden v. Swinburne, supra; Lanz v. Randall*, 4 Dill., [U. S.], 425; *Maloy v. Duden*, 25 Fed. Rep., 673.)   Relator is not required to qualify anew until this proceeding has determined that respondent is ineligible. (Code, sec. 711; *People v. McCallum*, 1 Neb., 182; *People v. Mayworm*, 5 Mich., 146; *State v. Griffey*, 5 Neb., 161, 173; *State v. Dahl*, 65 Wis., 510; *Meloney v. Whitman*, 10 Cal., 38, 46-7; *Jeter v. State*, 1 McCord [S. Car.], 233; *State v. Lylies*, Id., 238; *State v. Peck*, 30 La. Ann., 280, pt. 1.) Respondent cannot claim citizenship by virtue of the treaty of 1803; art. 3 thereof referred only to existing inhabitants of the territory ceded. (*State v. Primrose*, 3 Ala., 546.) The language of sec. 5 of the enabling act, "on an equal

footing with the original states," had no reference to rights, privileges, or immunities of individuals; it could not, therefore, affect citizenship. What *status* of the inhabitants was fixed by the enabling act? Why citizenship rather than the voting privilege? The reason for declaring the inhabitants of the original thirteen states to be citizens, arose from the necessities of the new government. (*Minor v. Happersett,* 21 Wall. [U. S.], 166.) Collective naturalization has been effected by *treaty* (Morse, Citizenship, sec. 94); but there is no record of an adjudication that the *admission* into the union of a territory would naturalize its alien inhabitants. This distinction between cession and admission was the basis of the holding in *State v. Primrose,* 3 Ala., 546, which overrules *U. S. v. Laverty* and *U. S. v. Debois,* cited by respondent, and shows that the admission of Alabama did not make citizens of all its inhabitants. The averment in the answer, upon information and belief, that Joseph Boyd, the father, became naturalized before 1854, is demurrable because the record is not pleaded; (*Tessier v. Englehart,* 18 Neb., 173; *Brady v. Murphy,* 19 Ind., 258; *Reasor v. Raney,* 14 Id., 441; *State v. Pierce,* 22 Id., 116; *Duyckinck v. Clinton, Ins. Co.,* 23 N. J. L., 279; *Crone v. Dawson,* 19 Mo. App., 214; *Bish v. Stansbury,* 59 Md., 382, and cases; Maxwell, Pl. & Pr. [4th Ed.], pp. 252, 401; 1 Chitty, Pleading [16th Am. Ed.], pp. 385, 570; Morse, Citizenship, sec. 87, and cases; *State v. Webster,* 7 Neb., 469), and does not raise an issue upon which proof can be taken. (*Dryden v. Swinburne,* 20 W. Va., 89; *In re Desty,* 8 Abb. New Cas., 250.) This court has jurisdiction in the case, by *quo warranto;* the matter need not be referred to the legislature. (*Atty. Gen. v. Barstow,* 4 Wis., 750; *Kane v. People,* 4 Neb., 509; Const., sec. 2, art. 6; High, Ex. Rem., 615, 634, 642; *State v. Messmore,* 14 Wis., 115.)

*John D. Howe, John C. Cowin,* and *J. C. Crawford,* contra:

Thayer is not a competent relator. If respondent holds office illegally, it is a public wrong and must be redressed by public authority, the attorney general alone having the right to bring the action. (*Com. v. Cluley*, 56 Pa. St., 270; *State v. Stein*, 13 Neb., 529; *State v. Cones*, 15 Id., 444; *State v. Hamilton*, 29 Id., 198; *State v. Frazier*, 28 Id. 438.) Possession is nine points in law; relator must show the tenth point before he will be entitled to the office. (*State v. McMillen*, 23 Neb., 385.) As respondent is in possession, the burden is on relator to show irregularity in the election. (*State v. Hunton*, 28 Vt., 594; *State v. Boal*, 46 Mo., 528; *Barnum v. Gilman*, 27 Minn., 466; High, Ex. Rem., secs. 652, 667, 700; *State v. Durkee*, 12 Kan., 308; *People v. Draper*, 24 Barb. [N. Y.], 265; *Hartt v. Harvey*, 32 Id., 55; *Cochran v. McCleary*, 22 Ia., 75; *Markle v. Wright*, 13 Ind., 548; *Updegraff v. Crans*, 47 Pa. St., 103; Hilliard, Injunctions, 446–9.) Sec. 7, ch. 10, Comp. Stats., requires an officer holding over to qualify anew "within ten days;" this, relator failed to do, and if he had any right to the office, he has thus abandoned it. (*County of Wapello v. Bigham*, 10 Ia., 39; *Scott v. Ring*, 39 Minn., 398; *State v. Goetz*, 22 Wis., 363; *State v. Matheny*, 7 Kan., 327; *State v. Johnson*, 26 Ark., 281.) Quo warranto is not the proper remedy; the jurisdiction of the legislature is exclusive. (*State v. Baxter*, 28 Ark., 129; *Baxter v. Brooks*, 29 Id., 174; *Goff v. Wilson*, 32 W. Va., 393; *State v. Marlow*, 15 O. St., 114; *Royce v. Goodwin*, 22 Mich., 496; *State v. Harmon*, 31 O. St., 260; *Hipp v. Charlevoix*, 62 Mich., 456; 2 Internat'l Rev., 74, art. by Judge Cooley; *Grier v. Shackleford*, 2 Const. [S. Car.], 646; *Newcum v. Kirtley*, 13 B. Mon. [Ky.], 517; *Smith v. Myers*, 9 N. E. Rep. [Ind.], 692; *Com. v. Leech*, 44 Pa. St., 332; *Collin v. Knoblock*, 25 La. Ann., 263; *Rogers v. Johns*, 42 Tex., 340; *Williamson v. Lane*, 52 Id., 346.) Ineligibility to election is not the same as ineligibility to office. (*Allen v. Robinson*, 17 Minn., 90.) One who has

taken out his first papers, and the children of such a person, are termed "citizens." (*Settegast v. Schrimp*, 35 Tex., 323; 28 Id., 96; *In re Wehlitz*, 16 Wis., 468; *Koszta's Case*, Ex. Docs., 33d Cong., 1st Sess., p. 25; *Levy's Case*, Cont. El., 1834–65, 38th Cong., 2d Sess.) The demurrer admits the most meritorious and equitable title to citizenship. Respondent, while under age, took the status of his father. (*Shanks v. Dupont*, 3 Pet. [U. S.], 242.) When he came to Nebraska his status was that of one who had taken out his first papers; surely the act of admission consummated all necessary title to citizenship; surely, if either son or father had taken out second papers within five years, the doctrine of relation would have applied. That a longer period elapsed does not affect the principle. For illustrations of the doctrine of relation, see *Johnson v. Ballou*, 28 Mich., 337; *Landes v. Brant*, 10 How. [U. S.], 371; note to 15 Am. Dec., 246. Over forty years ago, respondent put off allegiance to Great Britain and assumed allegiance to the United States. His intention is beyond question. During all this time has he been a man without a country? Would Great Britain have given him the protection of her flag? (*Osterman v. Baldwin*, 6 Wall. [U. S.], 122; *Jackson v. Beach*, 1 Johns. Cas. [N. Y.], 339; *Jackson v. Ramsay*, 3 Cow. [N. Y.], 75.) The oath confers citizenship; an order of court is not necessary (*Campbell v. Gordon*, 6 Cranch [U. S.], 176); nor need it appear of record that all requirements have been complied with. (*Stark v. Chesapeake Ins. Co.*, 7 Id., 420.) Citizenship may be presumed in certain cases. (*Blight v. Rochester*, 7 Wheat. [U. S.], 535; *Shelton v. Tiffin*, 6 How. [U. S.], 163.) That mode of acquiring citizenship which the naturalization act provides, is not exclusive. Citizenship may be acquired also by treaty, by annexation, by the admission of new states, and by the force of enabling acts, and acts of admission. The act admitting Nebraska provides that the state shall come into the Union "upon an equal footing with the origi-

nal states in all respects whatsoever." These words are significant, and they must be construed in the light of other acts of admission, and of similar instances in American history. In various cases where new states have been formed, or new territory acquired, the greatest care and precaution have been taken to place the rights, privileges, and immunities of the inhabitants on an equality with those of the original states. This was the spirit of the ordinance of 1787, establishing the Northwest Territory, and of acts of admission of states formed therefrom. (Ordinance 1787 sec. 13; Baldwin, Constitutional Views, pp. 88–93; *Dred Scott v. Sanford*, 19 How. [U. S.], 393.) The principle was followed in the Spanish cession of Florida (*U. S. v. Cruikshank*, 92 U. S., 542; *Am. Ins. Co. v. Canter*, 1 Peters [U. S.], 543); is most strikingly illustrated in the construction of the act admitting Louisiana (*Desbois Case*, 2 Martin [La.], O. S., 187; *U. S. v. Laverty*, 3 Id., 747); and receives judicial expression in language at once convincing and sublime, in cases involving the rights acquired by the citizens of Texas upon the admission of that state into the Union. (*Cryer v. Andrews*, 11 Tex., 183; *Barrett v. Kelly*, 31 Id., 481.) Indeed such has been the policy of the federal government from the time of its formation; for all existing inhabitants of the thirteen states were made citizens, and eligible to *all* offices, by the adoption of the constitution (*Minor v. Happerset*, 21 Wall. [U. S.], 167), and congress recognizes the rule as absolute. (Contested Election Cases, 2d Sess. 38th Cong., 41.) Citizenship, therefore, is a right inherent in the inhabitant upon the formation of a state government. (*McIlvaine v. Coxe*, 4 Cranch [U. S.], 209.) The very words "We, the people," used in the preamble of Nebraska's first constitution, plainly referred to the inhabitants of the then territory. It was *they* who composed the state upon its admission, and the rights granted to the state were granted to *them*. (*Dred Scott v. Sanford* and *U. S. v. Cruikshank,*

44

*supra;* Baldwin, Constitutional Views, 18.)    Moreover, if those inhabitants were not made citizens by the admission, how did they become such?    Citizenship of the United States presupposes citizenship of some state. (*Slaughter House Cases,* 83 U. S., 72.)    The conclusion, then, is irresistible that upon the admission of Nebraska, all its inhabitants, native or foreign born, except Indians, became, *ipso facto,* citizens of the United States. (See especially the Louisana cases, *supra.*)

NORVAL, J.

This is an action of *quo warranto,* brought in this court by John M. Thayer, in his own behalf, the attorney general having refused to prosecute the same, to establish the relator's right to the office of governor of this state, and to oust the respondent therefrom.    The information alleges:

" 1. On the Tuesday next succeeding the first Monday of November of the year 1888 he, the said John M. Thayer, was, and for more than two years next preceding that time had been, a citizen of the United States and of this state, and then had, and now has, all the qualifications required by law to hold the office of governor of the state of Nebraska.

" 2. At the general election of this state at the date aforesaid, for the election of governor and all state officers, in accordance with the provision of the constitution and laws of this state, he was duly elected governor; that he duly qualified and entered upon the duties of said office on the first Thursday after the first Tuesday in January, 1889, and ever since then he has exercised, and now exercises, the duties of said office.

" 3. That his said election and oath of office as governor made it his duty to hold his office for the term of two years from the first Thursday after the first Tuesday in the January next after his election, and until his successor should be elected and qualified.

"4. That there was held another general election of this state on the Tuesday next succeeding the first Monday of November in the year 1890, for the election of governor and other officers, and the returns of said election for the officers of the executive department were, as required by the constitution, sealed up and transmitted by the returning officers to the secretary of state, directed to the speaker of the house of representatives, who did, on the 8th day of January, 1891, immediately after the organization of the house and before proceeding to other business, open and publish the same, in the presence of a majority of each house of the legislature, who were for that purpose assembled in the hall of the house of representatives.

"5. That said returns so sealed up, transmitted, opened, and published showed that the whole number of votes cast at said general election for the several persons voted for for the office of governor aggregated 214,090; that of said number of votes so cast for governor, James E. Boyd received 71,331; J. H. Powers received 70,187; L. D. Richards received 68,878; and there were scattering 3,694; and James E. Boyd, being the person having the highest number of votes for the office of governor, was by said speaker declared duly elected governor for the term of two years from the first Thursday after the first Tuesday of January, 1891, and until his successor should be elected and qualified. And relator exhibits herewith and makes a part hereof a duly certified and authenticated copy of said returns.

"6. That thereupon the said James E. Boyd took the oath of office required to be taken by executive officers before they enter upon their official duties, and has usurped and invaded the office of governor of Nebraska, and has unlawfully attempted, and now unlawfully attempts, to hold said office and perform the duties of governor of Nebraska, and will continue so to do, unless ousted by the judgment of this honorable court.

"7. But the relator further gives the court to understand

and be informed that the said James E. Boyd was not at
the time of his said pretended election, on the said Tuesday
next succeeding the first Monday of November, 1890, a
citizen of the United States, and because he was not, as
aforesaid, then a citizen of the United States, he was not
then eligible to the office of governor of this state, and as
yet no person eligible thereto has been elected and qualified
to succeed your informant, and it is the bounden duty of
the relator to hold and continue in the office of governor
until some person eligible thereto shall be elected and qual-
ified as his successor; that in truth and in fact the said
James E. Boyd was born in Ireland, of alien parents, in
about the year 1834; that he was brought to this country,
when about ten years of age, by his father, whose name
was and is Joseph Boyd, who settled in about the year 1844
at Zanesville, Muskingum county, in the state of Ohio,
where he has ever since resided, and now resides; that the
said Joseph Boyd, father of the said James E. Boyd, has
never, since he came to this country and settled at Zanes-
ville, Ohio, resided at any other place.

"That on the fifth day of March, 1849, at, in, and dur-
ing the February (1849) term of the common pleas court
of said Muskingum county, in the state of Ohio, the said
Joseph Boyd, a native of Ireland, and father, as aforesaid,
of the said James E. Boyd—and when the said James E.
Boyd was about fifteen years of age—in open court, de-
clared it to be his *bona fide* intention to become a citizen of
the United States, and to renounce and abjure forever all
allegiance and fidelity to every foreign prince, potentate,
state, or sovereignty whatsoever, and particularly the queen
of Great Britain and Ireland."

(Here follows a copy of the journal entry from the rec-
ords of said common pleas court, showing such declaration
of intention.)

"8. And relator further gives the court to understand
and be informed that the said Joseph Boyd, father of afore-

said James E. Boyd, never, while the said James E. Boyd
was under the age of twenty-one years, applied to be ad-
mitted to become a citizen of the United States, and was
never naturalized and never did become a citizen of the
United States while the said James E. Boyd was under
the age of twenty-one years; that at, in, and during the
October (1890) term of the common pleas court, held
within and for the county of Muskingum, state of Ohio,
and never before, and not until after the said James E.
Boyd was upwards of twenty-one years of age, and not
until he was of the age of fifty-six years, the said Joseph
Boyd, father of the said James E. Boyd, a native of Ire-
land, and up to that time and then a subject of the queen
of Great Britain and Ireland, appeared in open court and
made application to be admitted to become a citizen of the
United States, and proved to the satisfaction of the court
that he declared his intention to become a citizen of the
United States on the fifth day of March, 1849, before the
court of common pleas of Muskingum county, Ohio, and
also produced his certificate of such declaration of inten-
tion, and that he had resided within the limits of the
United States five years then last past, and for one year at
least then last past, within the state of Ohio, and that dur-
ing that time he had behaved as a man of good moral
character, attached to the principles of the constitution of
the United States, and well disposed to the good order and
happiness of the same; and thereupon the said Joseph
Boyd made solemn oath that he would support the consti-
tution of the United States and that he did absolutely and
entirely renounce and abjure all allegiance and fidelity to
every foreign prince, potentate, state, or sovereignty, and
particularly to Great Britain and Ireland and the queen of
England, whose subject he then was. And the court being
then satisfied that said Joseph Boyd had complied with the
laws of the United States relating to the naturalization of
aliens, it was ordered that he be, and he then was, admitted

to become a citizen of the United States, a certificate thereof was then issued to him, and before that time he had never been and was not a citizen of the United States."

(Here is set out a certified copy of the records of said common pleas court, showing the application of Joseph Boyd to be admitted to become a citizen, and his admission to citizenship.)

"9. And the relator further shows that careful and diligent search has been made by the clerk of the court of common pleas of said Muskingum county, Ohio, through all the records of his said office, and the only record or journal entry in any shape or form in said court, and in the records thereof of or concerning the declaration of intention to become, and application of the said Joseph Boyd to be admitted, a citizen of the United States, in said office, is found upon page 187 of Journal 'T', and upon page 145 of Journal 42; and the only record or journal entries in said office, of the naturalization of said Joseph Boyd, is found upon said page 145 of said Journal No. 42; and that said two entries constitute the only and entire record of the naturalization of said Joseph Boyd as shown by the records and journals of said court. And the relator exhibits and shows to the court the certificate of the clerk of said court, duly signed, and made under oath, showing such facts.

"10. And the relator further shows that the said James E. Boyd has never at any time declared his intention to become a citizen of the United States, nor has he ever made application to be admitted as a citizen of the United States; but has ever remained an alien and a subject of the queen of Great Britain and Ireland. And relator says, by reason of the premises and by reason of the legal disqualification of the said James E. Boyd to hold said office of governor, the said election for governor was and is null and void.

"11. And the relator further shows that notwithstanding the fact that the said James E. Boyd was and is ineli-

gible to the office of governor as aforesaid, and notwithstanding the fact that the relator is bound to continue in and to hold the office of governor and is entitled to the peaceable and undisturbed possession of the office of governor and the furniture and records thereof, yet the said James E. Boyd has usurped and invaded the office of governor of Nebraska unlawfully, and has unlawfully undertaken to perform the duties of said office, and the relator has refused, and refuses for the reasons hereinbefore stated, to surrender said office to said defendant, and will not do so unless required so to do by the judgment of this honorable court upon due hearing had."

The relator prays for a judgment of ouster, and that he be declared entitled to said office, until such time as some person eligible thereto shall be elected and qualified as his successor.

To the information the respondent filed a motion to dismiss the cause on the grounds:

1. That the relator has no right to institute or maintain the action.

2. That the petition does not state facts sufficient to constitute a cause of action.

3. That the petition shows that the respondent is the duly elected, qualified, and acting *de jure* governor, and is entitled to hold and discharge the duties of said office for the term of two years from the 8th day of January, 1891.

After argument at the bar the motion was overruled, and thereupon the respondent answered the relation as follows:

"Now comes the respondent, James E. Boyd, and admits that the attorney general of this state refuses to prosecute this action and protests and insists and avers the fact to be that the information herein is insufficient in law to require the respondent to make answer thereto; for that it does not show that said John M. Thayer has any right or title to the said office of governor of Nebraska, or that he

has any right, title, or authority to institute, maintain, or prosecute this action; and for that said information does not state facts sufficient to constitute a cause of action.

"Further answering, respondent admits the allegations of the first, second, third, fourth, and fifth paragraphs of the information, except as hereinafter shown.    Further answering, said respondent shows to the court that said John M. Thayer was, at the regular state election held in the state of Nebraska in November, A. D. 1888, elected to the office of governor of this state for a term thereof commencing in January, 1889, and that upon the canvass of the votes cast at said election he was duly declared to be so elected; that the term of said office is fixed by the constitution to commence on the first Thursday after the first Tuesday in January succeeding the election, and continues for a period of two years and until his successor shall be elected and qualified.    And the respondent further says that the laws of Nebraska at all the times herein mentioned provided that, if a qualified incumbent of the office holds over by reason of the non-election or non-appointment of a successor, he shall qualify within ten (10) days from the time at which his successor, if elected, should have qualified by taking the oath of office, executing it, in having approved and filed for record his official bond in the sum of fifty thousand (50,000) dollars, conditioned for the faithful performance of the duties of the office, as by law required.

"Respondent further says that the said John M. Thayer continued as the actual incumbent of said office down to the time when this respondent qualified as governor of this state on the 8th day of January, 1891, which was the first Thursday after the first Tuesday in January succeeding the election in question.    Respondent further says that the said John M. Thayer has never since the 8th day of January, 1891, qualified anew as governor of the state of Nebraska; that he has not since that date taken or filed the official oath required by law, nor has he had his official

bond executed, or approved or filed for record, as by law required, to qualify him anew if no party was elected to hold said office of governor from and after the said 8th day of January, as he alleges in his information, but which respondent denies; and in this behalf further alleges the fact to be that after the said 8th day of January, 1891, the respondent entered into the office of governor of the state of Nebraska, and the said John M. Thayer from that time and thereafter wholly surrendered, abandoned, and removed from said office, and has not since in any manner, directly or indirectly, occupied or possessed the same, or assumed, or pretended to assume, to perform any of the functions thereof, but wholly surrendered same and vacated said office.

"Answering the sixth paragraph of said information, the respondent admits that after his election to the said office, and the canvass of the returns, and after he had been declared elected to the said office by the speaker of the house of representatives, in the presence of a majority of the legislature, as required by law, he on the 8th of January, 1891, took the oath of office, executed and filed his official bond, did all other acts and things required by law of him to be done to qualify and entitle him to enter into the possession, use, and employment of said office and to discharge the duties thereof; and the respondent denies that he has usurped or invaded the said office, or unlawfully attempted at any time to hold said office and to perform the duties thereof, but avers the fact to be that at and from the commencement of the term of his said office, from January 8, 1891, he has been and now is the duly elected and qualified governor of the state of Nebraska, in the quiet, legal, and actual possession and enjoyment of said office and discharging his duties; that he has been recognized so to be by all of the departments and officers of the state government.

"And the respondent further avers the fact to be that the

said John M. Thayer ceased to be the incumbent of said office in law, and in fact, with the expiration of the 8th day of January, A. D. 1891, and prior to the commencement of this action.

"Answering the eighth paragraph of said information, the respondent denies all the allegations thereof, except that he was born in Ireland of alien parents in the year 1834; that he was brought to this country when about ten years of age by his father, Joseph Boyd, who settled about the year 1844, in Belmont county, Ohio, where he resided for several years, and thereafter removed to Zanesville, Muskingum county, Ohio, where he has ever since resided.

"Respondent also admits that his father, on or about March 5th, 1849, when respondent was about fourteen years of age, declared his intention to become a citizen of the United States and to renounce and abjure forever all allegiance and fidelity to every foreign prince, potentate, state, and sovereignty whatever, and particularly the queen of Great Britain and Ireland; and that the alleged exemplification of the record thereof, copied in said information, respondent believes, is a true copy.

"Answering the eighth paragraph of said information, respondent says he admits the facts therein alleged, except as in this answer otherwise averred, but denies the conclusions of law and facts therein stated.

"Respondent further avers that his father, for forty-two years last past, has enjoyed and exercised all of the rights, immunities, and privileges, and discharged all the duties of a citizen of the United States and of the state of Ohio, and was, in all respects and to all intents and purposes, a citizen of the United States and of the state of Ohio, at all times disclaiming and abjuring allegiance to every foreign prince, potentate, state, or sovereignty; that all of said times said Joseph Boyd behaved as a man of good moral character, attached to the principles of the constitution of the United States and well disposed to the good order and

happiness of the same; that when the said Joseph Boyd settled in the state of Ohio as aforesaid, it was his *bona fide* intention to make the United States his permanent residence; that at that time he did, in fact, disclaim and abjure all allegiance and fidelity to the queen of Great Britain and Ireland, and to every other foreign prince, potentate, state, and sovereignty, and for about forty years acted in the belief that he was a citizen of the United States, all said times exercising the elective franchise without question or challenge, voting for all officers of the state and federal governments the same as a native-born citizen of the United States and of the state of Ohio.

"Respondent further says that about the year 1870 said Joseph Boyd was elected to the office of justice of the peace in said Muskingum county, Ohio, and thereupon took an oath to support the constitutions of the United States and of the state of Ohio, and for several years held said office, exercising all the rights, franchises, poweis, and duties of said office, and has for years last past held office under the constitution and laws of Ohio, to-wit, weighmaster in the city of Zanesville, which office he now holds.

· "Respondent further says that he was informed by his father as early as the year 1855 that he, the said Joseph Boyd, was a citizen of the United States and entitled in law and in fact to all the rights, privileges, and immunities of a citizen of the United states and of the state of Ohio, and that, ever since said time, this respondent has so believed and accepted the fact so to be, and never heard the fact challenged or questioned till after he was elected to the office of governor of this state in 1890.     Respondent further says that he did, upon arriving at the age of twenty-one years, exercise the election franchise in said Muskingum county, Ohio, in the fall of 1855.

" The respondent further alleges, on information and belief, that, prior to October, 1854, his father did in fact complete his naturalization in strict accordance with the

acts of congress known as the naturalization laws, so as to admit and constitute him a full citizen of the United States thereunder, he having exercised the rights of citizenship herein described, and at said time informed respondent that such was the fact; that when his father applied to be registered in Ohio, in October, 1890, under a new law, he was required to produce his citizenship papers and being unable to find all thereof, he appeared before said court of common pleas of Muskingum county, at the October term thereof, 1890, and the proceedings described in the ninth paragraph of the information were had as therein set out, but respondent avers the fact to be, on information and belief, that, in the matter of said proceedings, said Joseph Boyd acted unadvisedly and ignorantly, the said last named proceedings being in that event unnecessary.

"Respondent further says that in the year 1856, at the age of twenty-two, he left his father's home in Ohio, in the firm belief that he, respondent, was a citizen of the United States in law and in fact, to establish himself in life; that he went to the state of Iowa, where he resided for a few months.

"In the month of August, 1856, respondent removed to the territory of Nebraska, which was then, to a large extent, a wilderness, and settled in Douglas county, where he resided for two years, working at his trade as a carpenter, and in 1857 he was elected county clerk of said county and took an oath to support the constitution of the United States and the provisions of the organic act under which the territory of Nebraska was created. Respondent removed to what is now Buffalo county, near old Fort Kearney, which was then upon the extreme frontier, in the fall of 1858, where he engaged in the business of farming in the midst of great perils from hostile Indians, suffering years of extreme hardship; in 1864, at the time of the Indian outbreak in said vicinity, when the lives and property of settlers were destroyed or endangered, when many settlers were massa-

cred, when hostile Indians killed cattle before the door of the home of his family, he volunteered his services as a soldier of the United States, which were accepted by the United States government, he being sworn into its military service by order of General R. B. Mitchell; that he served as a soldier of the United States, without compensation or reward, to protect the men, women, and children of the frontier and to maintain the authority, honor, and flag of the United States government.

"In the year 1866 respondent was elected a member of the house of representatives of Nebraska to represent the counties of Buffalo and Hall; that he served as such officer in the following session of the legislature, to which was submitted the proposition of the congress of the United States to accept the first constitution of this state with the conditions imposed by the act of congress, known as the enabling act below named; that before entering upon the duties of said office he took the oath required by law and swore to support the constitution of the United States and the provisions of the organic act under which the territory of Nebraska was created.

"In 1868 respondent removed to Douglas county, where he has since resided. In the year 1871 respondent was elected by the electors of said county a member of the convention of the people of the state of Nebraska to form a state constitution, and, after taking the oath required by law to support the constitutions of the United States and state of Nebraska, in fact served as a member of said convention.

"In the year 1875 the respondent was elected by the electors of said county a member of the convention of the people of the state of Nebraska to form a constitution, which convention discharged that duty in the year 1875, which resulted in forming the constitution under which the government of this state has since existed; respondent, after taking the oath required by law to support the constitutions of the United States and of this state, in fact served as a member of said convention.

" In 1880 respondent was elected and acted as president of the city council of the city of Omaha.

" In 1881 respondent was elected mayor of the city of Omaha and served in said office for two years. In 1885 respondent was again elected to said office of mayor and served for two years, and before taking the office of mayor each of said times respondent took an oath to support the constitutions of the United States and of the state of Nebraska.

" Respondent further says that during said period of over thirty years he has exercised the elective franchise in said territory and state of Nebraska, and enjoyed all the rights, privileges, and immunities of a citizen of the United States and of said territory and state.

" Respondent further says that for over thirty-two years last past he has been in fact and in law, a citizen of the United States and of said territory and state; that neither the United States, nor the territory or state of Nebraska, has ever challenged his citizenship, or sought to oust him of the franchise actually enjoyed and exercised by him to be a citizen of the United States, and that it is not competent for this relator so to do ; that if his said right and privilege of being a citizen of the United States is subject to· challenge, it is solely for the United States, in its sovereign capacity, to challenge the same.

"And he further avers that he was, at the time of the election in question, and for more than two years prior thereto, eligible to be elected to and to hold said office of governor for the term in question.

" Respondent further says that in 1849 it was his *bona fide* intention to be a citizen of the United States, and that he then renounced and abjured forever all allegiance and fidelity to every foreign prince, potentate, state, or sovereignty whatever, and particularly the queen of Great Britain and Ireland; that during all the time since he has behaved as a man of good moral character, attached to the

principles of the constitution of the United States and well disposed to the good order and happiness of the same, and all said time has absolutely renounced and abjured all allegiance and fidelity to every foreign prince, potentate, state, or sovereignty, and particularly the queen of Great Britain and Ireland.

"Further answering, respondent shows to the court that after his said election as governor, and after he had learned for the first time that his citizenship had been questioned, and on December 16, 1890, he went before the district court of the United States for the district of Nebraska, for the purpose of removing all doubts that might arise thereafter in respect thereof, and by petition to said court represented to that court the facts necessary to be known in that behalf, touching his said history and citizenship of the United States, insisting therein that he was and had been for more than two years next preceding his election to the office of governor, in November, 1890, a citizen of the United States, and also representing to said court that a question had been raised as to his citizenship; whereupon said court, by its judgment, found, determined, and adjudged that he was in fact and law a full citizen of the United States, and respondent avers that he is, and for many years last past has been, a citizen of the United States within the meaning and requirements of the acts of congress of the United States.

"A copy of which petition, judgment, and record is hereto attached and made part of this answer.

"Respondent denies the allegations of the 9th, 10th, and 11th paragraphs of said information, except that he refuses to surrender said office of governor to the said relator and all other allegations of said information not hereinbefore admitted or specially answered.

"Wherefore, respondent prays to be hence dismissed with his costs in this behalf most wrongfully expended, and for such other and further relief as may be just and proper."

The relator demurred to the answer on the ground that the facts stated therein are insufficient in law to constitute a defense. The case was submitted upon able arguments at the bar, and exhaustive briefs.

We are met at the outset of our investigation with the proposition that this court has no jurisdiction to hear and determine the right of the respondent to hold the office of governor. Section 2 of article 6 of the constitution confers upon the supreme court original jurisdiction in *mandamus, quo warranto,* and *habeas corpus.*

Section 704 of the Code of Civil Procedure provides that "An information may be filed against any person unlawfully holding or exercising any public office or franchise within this state, or any office in any corporation created by the laws of this state, or when any public officer has done or suffered any act which works a *forfeiture of his* office," etc.

Section 710 provides that " When the defendant is holding an office to which another is claiming the right, the information should set forth the name of such claimant, and the trial must, if practicable, determine the rights of contesting parties."

Section 717 provides that " When an information is upon the relation of a private individual, it shall be so stated in the petition and proceedings, and such individual shall be responsible for costs in case they are not adjudged against the defendant," etc.

These, as well as other statutory provisions not quoted, give a party who claims a public office the power to institute in the supreme court *quo warranto* proceedings in his own name, to test the right of the incumbent to discharge the duties of such office. Authority is likewise conferred upon the attorney general to bring such an action.

It is claimed that an information in the nature of a *quo warranto* will not lie against one holding the office of governor. In *State v. Thayer, ante,* p. 82, we held that *man-*

*damus* will lie against the governor to compel the perform-
ance of an official duty which is purely ministerial.    And
at the present term, in *State v. Elder, ante,* p. 169, it was
decided that it was the duty of the speaker of the house
of representatives, immediately upon the organization of
the house, and before proceeding to other business, to open
and publish the returns of the election for officers of the
executive department, and that the duty thus enjoined upon
the speaker by the constitution was a ministerial duty,
which would be enforced by *mandamus.*

While it is true the executive and judicial departments
of the state government are equal, co-ordinate, and independ-
ent branches, and the officers of one department are pro-
hibited by the constitution from exercising any powers or
duties properly belonging to the other, yet it does not log-
ically follow that the judiciary is powerless to hear and
determine whether the person discharging the duties of the
office of governor is disqualified by the constitution from
holding the office.    This court, by entertaining a proceed-
ing brought to test the right of the relator and the respond-
ent to the office of governor, does not exercise nor assume
to exercise any power belonging to the executive depart-
ment.    The sole object and purpose of this proceeding is
to ascertain who, under the constitution and laws, is en-
titled to perform the duties of that office.

Mr. High, in his book on Extraordinary Legal Reme-
dies, section 634, says : " The office of governor of a state
is regarded as a civil office of such a nature as to be amen-
able to the exercise of the jurisdiction under discussion.
And where, by the constitution and laws of a state, its
highest judicial tribunal is vested with jurisdiction by
information in the nature of a *quo warranto* to prevent the
citizens of the state from usurping its offices and franchises,
an unlawful intrusion into the chief executive office of the
state may be tried by this proceeding to judgment of ouster.
In such case a plain distinction is recognized between a

45

department of the government and the person assuming to exercise its duties, and the judicial branch of the government in no manner interferes with, or attempts to control, the legitimate functions of the executive department, but only seeks to protect the people from an unlawful usurpation of a high public office or franchise." The text of the learned author is fully sustained by the able opinions of the court in the case of the *Attorney General v. Barstow*, 4 Wis., 750.

But it is contended that the constitution having provided that contested elections for all officers of the executive department shall be determined by the legislature, that remedy is exclusive of all others. The authorities cited in the brief of the respondent sustain the proposition. But the holdings of this and other courts are the other way, that the remedy by contest is not the sole remedy.

In *Kane v. People*, 4 Neb., 509, was a proceeding by *quo warranto*, brought in the district court of Cheyenne county by Henry Snyder to test the right of Thomas Kane to hold the office of county treasurer of that county. On error to this court, objection was made that the court had no jurisdiction. In the opinion prepared by the then Chief Justice LAKE it was held that the remedy by contest is merely cumulative and that *quo warranto* is a concurrent remedy.

In *State v. Stein*, 13 Neb., 529, was a proceeding by *quo warranto* to try the right of the respondent, Robert P. Stein, to the office of county treasurer of Kearney county. It was ruled that the supreme court had jurisdiction. To the same effect are *Attorney General v. Barstow*, 4 Wis., 750; *State v. Messmore*, 14 Id., 115, and *People v. Holden*, 28 Cal., 123.

While the constitution declares that contests of the election of officers of the executive department are to be tried by the legislature, the same instrument, as already stated, confers jurisdiction in *quo warranto* upon the supreme

court.    It was not the intention of the framers of the constitution that the remedy by contest should impair the right of the judiciary to inquire into the authority by which any person assumes to exercise the duties of an office of the executive department, and to remove him therefrom, if he is constitutionally ineligible to be elected to or hold such office.    We have no doubt that this court has jurisdiction of the case.

It appears from the pleadings that the respondent received a plurality of the votes cast for the office of governor at the general election held in November, 1890.    It is claimed by the relator that the defendant did not become a citizen of the United States until after such election, and therefore he was not eligible to, nor legally elected to, such office.

Section 2 of article 5 of the constitution reads : " No person shall be eligible to the office of governor, or lieutenant governor, who shall not have attained the age of thirty years, and been for two years next preceding his election a citizen of the United States and of this state. None of the officers of the executive department shall be eligible to any other state office during the period for which they shall have been elected."

The word " eligible " is defined in the Century dictionary to be " qualified to be chosen ; legally qualified for election or appointment."    Substantially the same definition of the word is given in Webster's dictionary.    In this sense the word " eligible" is used in the constitution.    The above constitutional provision was intended as a restriction upon the electors in choosing their governor and lieutenant governor.    The people are prohibited from selecting any person to fill either of these offices who has not been a citizen of this state and of the United States for at least two years next preceding the election at which such officers are to be chosen, or who is under the age of thirty years.

Section 97 of chapter 26, Comp. Stats., provides that

" When .the person whose election is contested is found to have received the highest number of legal votes, but the election is declared null by reason of legal disqualification on his part, or for other causes, the person receiving the next highest number of votes shall not be declared elected, but the election shall be declared void." It is plain, whether we construe this section and the quoted provision of the constitution together or separate, that the effect of a person receiving a plurality of votes for the office of chief executive of the state, who does not possess the constitutional qualifications to be chosen, is to avoid the election and not to elect the person receiving the next highest number of votes for that office. (*State v. McMillen*, 23 Neb., 385; *In re Corliss*, 11 R. I., 638 ; *Dryden v. Swinburne*, 20 W. Va., 134; *State v. Sullivan*, 47 N. W. Rep., 802; *Saunders v. Haynes*, 13 Cal., 154; *Commonwealth v. Cluley*, 56 Pa. St., 270; *Com. v. Hanley*, 9 Id., 513 ; *State v. Jenkins*, 43 Mo., 261; *Gulick v. New*, 14 Ind., 93 ; *State v. Swearingen*, 12 Ga., 23; *State v. Smith*, 14 Wis., 497; *State v. Gastinel*, 20 La. Ann., 114; *People v. Clute*, 50 N. Y., 451.) The question is so fully considered in these cases that further discussion is entirely unnecessary.

The record shows that the respondent, James E. Boyd, was born in Ireland, of alien parents, in the year 1834, and that he was brought to this country when ten years of age by his father, Joseph Boyd, who, since the year 1844, has resided in the state of Ohio. Joseph Boyd, on March 5, 1849, at Zanesville, Muskingum county, Ohio, before the common pleas court of that county, declared his intention to become a citizen of the United States, and in October, 1890, the said Joseph Boyd duly made application to the common pleas court of said Muskingum county to be admitted to become a citizen of the United States, and he was thereupon by the order of said court duly naturalized.

On the 16th day of December, 1890, the respondent, before the district court of the United States for this dis-

trict, declared his intention to become a citizen of the United States, and at the same time made application to be admitted to become a naturalized citizen.    By the order of said court he was on said last named date admitted to citizenship.

Did the naturalization of Joseph Boyd in 1890 make the son a citizen?    Section 4 of the act of congress entitled "An act to establish a uniform rule of naturalization," etc., approved April 14, 1802, the same being section 2172 of the Revised Statutes of the United States, reads as follows:

"Sec. 4. The children of persons who have been duly naturalized under any law of the United States, or who, previous to the passing of any law on that subject by the government of the United States, may have become citizens of any one of the states under the laws thereof, being under the age of twenty-one years at the time of the naturalization of their parents, shall, if dwelling in the United States, be considered as citizens thereof; and the children of persons who now are, or have been, citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens thereof; but no person heretofore proscribed by any state, or who has been legally convicted of having joined the army of Great Britain during the revolutionary war, shall be admitted to become a citizen without the consent of the legislature of the state in which such person was proscribed."

Under the provisions of this section the minor children of an alien, born out of the United States, if dwelling in the United States at the date of the naturalization of their parents, become *ipso facto* citizens by such naturalization; but it does not have the effect to make the children citizens if they are more than twenty-one years of age at the time the parent is admitted to citizenship.    As the respondent was about fifty-six years old when his father was natural-

ized, it is obvious that such naturalization did not make the son a citizen. (*Dryden v. Swinburne*, 20 W. Va., 89; *State v. Andriano*, 92 Mo., 70; *Gumm v. Hubbard*, 97 Id., 311; *State v. Penny*, 10 Ark., 621; *O' Connor v. State*, 9 Fla., 215; *U. S. v. Kellar*, 13 Fed. Rep., 82; *Campbell v. Gordon*, 6 Cranch, 176.)

We have found no case, and none has been cited by counsel, which holds that the naturalization of a parent makes his children, who are at the time over the age of twenty-one years, citizens.

The respondent in his answer alleges, upon information and belief, that prior to October, 1854, his father completed his naturalization in strict accordance with the laws of congress on that subject. This allegation is insufficient to show that Joseph Boyd was a citizen of the United States. It is nowhere averred that any court admitted him to become a citizen prior to October, 1890. The name of the court should be averred, so as to show that the proceedings were before a tribunal having jurisdiction of the matter. The order of a court admitting an alien to citizenship is a judicial act, in the nature of a judgment. Such proceedings are required to be made a matter of record. The record must be pleaded and proved the same as any other judicial record. Naturalization cannot be established by parol. (*Ex parte Knowles*, 5 Cal., 300; *Bump v. Commonwealth*, 30 Pa. St., 475; *In re Clark*, 18 Barb., 444; *Morgan v. Dudley*, 18 B. Mon., 693; *Green v. Salas*, 31 Fed. Rep., 106; *Dryden v. Swinburne, supra; State v. Penny*, 10 Ark., 621; *Spratt v. Spratt*, 4 Peters, 393; *Bode v. Trimmer*, 23 Pac. Rep., 187.)

The fact that Joseph Boyd, for more than forty years, voted at elections and held public offices in the state of Ohio falls far short of raising a presumption that he was admitted to citizenship prior to October, 1890. It is clear that voting and holding office do not make an alien a citizen of the United States, nor raise a presumption of such.

The fact that Joseph Boyd was admitted and declared a citizen in October, 1890, in the county where he had lived for forty years, and in the same court in which he declared his intention to become a citizen on March 5, 1849, strengthens the conclusion that he was not naturalized until October last.    Nor does the fact that James E. Boyd has at each election in this state exercised the elective franchise, and has frequently been elected to and held important public offices, make him a citizen of the United States. This proposition is sustained by the following authorities: *Dryden v. Swinburne, supra; Lanz v. Randall,* 4 Dillon, 425 ; *Maloy v. Duden,* 25 Fed. Rep., 623.

It is evident that the numerous oaths taken by the respondent to support the constitution of the United States and of this state did not make him a citizen of the United States.    In order that an alien may be admitted to citizenship, he must prove to the satisfaction of some court having jurisdiction of the matter the facts required by the act of congress on that subject, and at the same time declare, on oath, before such court "that he will support the constitution of the United States and that he absolutely and entirely renounces and abjures all allegiance and fidelity to every foreign prince, potentate, state, or sovereignty, and particularly, by name, to the prince, potentate, state, or sovereignty of which he was before a citizen or subject." (U. S. Rev. Stats., sec. 2165.)    Congress has established a uniform rule of naturalization, and an alien cannot be admitted to citizenship thereunder unless he follows the mode prescribed by the naturalization laws.    The oaths taken by the respondent to uphold the federal constitution do not appear to have been administered by a court having jurisdiction, nor is it averred that he declared in any of the oaths that he absolutely renounced all allegiance to the queen of Great Britain and Ireland, of whom he was a subject.

It is insisted that Joseph Boyd having declared his in-

tention to become a citizen while James E. Boyd was a
minor, the son took the status of the father, and the natu-
ralization of the respondent in December, 1890, relates back
to and makes him a citizen from the time his father made
his declaration of intention. This position is untenable.
The provisions of the constitution elsewhere quoted makes
a person ineligible to the office of governor who is not a
citizen of the United States for two years prior to the election.
The respondent being disqualified to be elected when the
votes were cast, his election was a nullity. His subsequent
naturalization could not give validity to that which was void.
Naturalization is not retroactive, and the doctrine of relation
has no application to the case at bar. (*Dryden v. Swinburne,*
20 W. Va., 134; *Heney v. Brooklyn Benevolent Society,* 39
N. Y., 333; *Priest v. Cummings,* 20 Wend., 342.)

Judge Green in his opinion in *Dryden v. Swinburne,*
*supra,* says: "Another position taken is, that the naturali-
zation of Ralph Swinburne in 1866 related back to 1852,
when he made his declaration, and he is therefore to be now
considered as a citizen from that date." No authority is
cited to sustain this novel position, except a number of
cases on entirely distinct subjects, in which, for reasons ap-
plicable to such cases, the law permits in certain cases a re-
lation back. Thus an office found when returned relates
back and vests title in the commonwealth from the finding.
So the appointment of an administrator for certain purposes
relates back to the death of the testator. A patent, when
issued, relates back to the entry. A sale, when confirmed
by a court of equity, relates back to the time of the sale.
The astute counsel could have found, no doubt, many other
cases where the law allows such relation back, some times
for all purposes and at other times for certain purposes only.
On the other hand innumerable cases might be cited where
there is no such relation back. Each case of this charac-
ter is based on reasons applicable to it specially. But what
possible bearing they, or the reasons on which they are

State, ex rel. Thayer, v. Boyd.

based, have upon the present case I confess I am unable to perceive. The only matter referred to in this connection which has any reference to naturalization is not a judicial case but the action of the federal government, many years since, in demanding the release of an Austrian, Martin Coster, who had declared his intention to become a citizen of the United States and who was afterwards unjustly imprisoned by the Austrian government. This shows that a person, who has declared his intention to become a citizen of the United States, has certain rights which our government will protect. Doubtless he has many rights which the courts will protect, but this certainly does not show that he has all the rights of a citizen. If it shows anything, which has any relation to the matter before us, it shows too much. If Martin Coster had the rights of a citizen he had them before he was naturalized, for when he was arrested he had not been naturalized."

In the New York case Woodruff, J., in speaking for the court, says: "It is clear, I think, that we are to seek for the legal effect of naturalization in the statutes by which it is authorized, and in such legislation as has been had in our own state on the subject. It is not to be determined upon a mere definition of the term 'naturalization.' But if it were, it would be most logical and most consistent with sound principle to say that the subject, when naturalized, began to have capacities pertaining to citizenship available for the future, and only in such future. If it were conceded, that the congress of the United States have power to declare the effect of naturalization, so as to give to the subject thereof all the rights, retroactively as well as prospectively, which he would have or would have had if native born, of which, in respect to real estate within the state, the transfer, transmission, and descent of which is peculiarly matter of state policy, there is great room for doubt; I think it clear, that the naturalization laws of the United States admit of no such construction.

"Under those laws the applicant is admitted to citizenship; upon complying with certain prescribed conditions, he becomes a citizen. He is put in a condition, or acquires a character, in which he can have and enjoy all the rights and privileges which, by law, pertain to citizenship, and that is all. But all this is according to the plain reading of the laws, prospective. His capacity then begins to be useful, or efficient to enable him to enjoy whatever pertains to his new character."

We therefore reach the conclusion that the naturalization of the respondent by the order of the United States court last December has no retroactive effect, and in reaching this conclusion we have not overlooked the authorities cited by counsel for respondent upon this branch of the case. They are not analogous to the case before us.

There is another good reason for holding that the naturalization of James E. Boyd does not relate back to the time his father took out his first papers. Such papers were of no avail to the son when he made application to be admitted to citizenship. James E. Boyd was compelled, before he was naturalized, to declare his intention to become a citizen. Under the acts of congress, James E. Boyd, being under the age of twenty-one years when he came to the United States, was authorized to do this at the same time he applied for citizen papers. It was all one transaction on the same day. The doctrine of relation could not therefore apply in this case.

It is urged that the respondent became a citizen of the United States by the admission of the territory of Nebraska as a state into the Union. We will now examine the question thus presented. The enabling act, approved April 19, 1864, provides that whenever a constitution shall be formed by the people of the territory of Nebraska, in compliance with the provisions of the act, "it shall be the duty of the president of the United States to issue his proclamation declaring the state admitted into the Union

on an equal footing with the original states, without any further action whatever on the part of congress." Afterwards, on the 1st day of March, 1867, the president of the United States issued his proclamation, wherein he declared and proclaimed the fact "that the fundamental conditions imposed by congress on the state of Nebraska, to entitle that state to admission to the Union, have been ratified and accepted, and the admission of said state into the Union is now complete."

The question for consideration is, whether the admission of Nebraska as a state into the Union on an equal footing with the original states as provided by the enabling act, and the proclamation of the president, made all the inhabitants therein, *ipso facto*, citizens of the United States. Similar language is found in the enabling acts by which various territories were authorized to form state governments in order to be admitted into the Union as states. It will be observed that the enabling act of Nebraska contains no provision touching the rights, privileges, and immunities of the inhabitants, upon the state coming into the Union. The inhabitants of the territory, at the time the state government was formed, were subject to the jurisdiction of the United States and were already citizens of the United States, excepting such as were aliens. These inhabitants, who were citizens of the United States, were none the less citizens by reason of the fact that they were inhabitants of the territory. Citizens of the United States do not lose their citizenship by changing their residence from a state to a territory. Citizens of the United States residing in the District of Columbia and in the territories are such citizens to the same extent that they would be if residing in one of the states. ( *Prentis v. Brennan,* 2 Blatch., 164; *Picquit v. Swan,* 5 Mason, 54.)

It may be safely stated that about as large a proportion of the inhabitants of the territory of Nebraska were citizens of the United States as of the inhabitants of any of

the states of the Union. There was no occasion, therefore, for congress to intend the admission of the state into the Union as an act of collective naturalization. There was no more urgency or necessity for such a collective act of naturalization in the territory than there would be to pass, from time to time, acts for collective naturalization of aliens residing within the states. If congress had intended the admission of new states into the Union, under the various enabling acts, to operate as a naturalization of all aliens residing therein, it is reasonable to suppose that it would have been so provided in the acts themselves in unmistakable terms.

The constitution of the United States has conferred upon congress the power to pass naturalization laws, and congress has passed many acts on that subject. If congress intended to extend the right of naturalization of aliens by the enabling act, outside of and beyond the various acts of congress upon that subject, it would have so provided in the enabling act in language so plain and explicit as not to require construction. Applying the accepted rules of statutory construction, it cannot be held that the enabling act was intended to relate to naturalization, either individually or collectively, and in contravention of the naturalization acts of congress, without it being so specifically stated in the enabling act.

Collective naturalization is where the government, by treaty or cession, acquires the whole or a part of the territory of another nation and takes to itself the inhabitants thereof. For illustration of this we refer to the treaty of Paris, by which we acquired Louisiana territory; the treaty with Spain, by which we acquired Florida; the treaty of Guadalupe Hidalgo, by which we acquired New Mexico and California, and the resolution of congress by which the republic of Texas was annexed to the United States. The power to confer such collective naturalization was not expressly conferred upon congress by the constitution, but,

doubtless exists in the government as a necessary part of the treaty-making power. It being granted that the power exists in congress to acquire territory by purchase, treaty, or cession, then it follows that the terms of such purchase, treaty, or cession may provide for the naturalization, *in solido*, of such of the inhabitants of the acquired territory or country as may elect to adhere to the new government. This as a matter of political necessity, the reasons for which are clear. These inhabitants are presumably natives of the soil; they constitute the body of the people; there are no courts of the new government established in such acquired territory to administer the uniform rule of naturalization established by congress, nor will there likely be in the near future. Without this power, then, the whole body of the inhabitants of the acquired territory must of necessity remain for a long and indefinite period without allegiance to, or the rights of citizenship, in any country. This principle cannot, however, be applied to Nebraska, for the reason that the territory of Nebraska, as well as the inhabitants thereof, were already within the jurisdiction of the United States and subject to the general government. Federal and territorial courts had been established in the territory with ample power to naturalize foreigners, and were in the daily exercise of such powers. But a small per cent of the inhabitants were of foreign birth, and most of these had taken the initiatory steps to become naturalized by judgment of the courts under the general law of congress. This question is made more clear by reference to the language of the enabling act. It provides that the state shall be admitted into the Union on an equal footing with the original states. It was the state which was admitted into the Union. The land, personal property, and inhabitants were already within the jurisdiction of the federal government. The state, in its municipal and sovereign capacity, was a new creation. It was the state thus newly created in its sovereign capacity that was admitted into the Union.

It may be said that the inhabitants make the state; nevertheless the state in its political organization is entirely different and distinct from the inhabitants who may happen to reside therein.

The words "equal footing with the original states" cannot fairly be construed to have any reference to the status of the inhabitants. The word "footing" is defined "firm position; established place; relative condition." We must look to the constitution of the United States to find out what the "firm position," "established place," and "relative condition" of the various states are. The rights of the states thus referred to are defined in the constitution, such as having representation in the respective houses of congress and in the electoral college, and other relative rights more particularly described in article 4 of the constitution of the United States. The position and relative rights of the states set forth and defined in the constitution, which were possessed by the original states by virtue of the adoption of the constitution of the United States, were what were intended to be secured to Nebraska by the enabling act.

If that act is to be construed as fixing the status of the inhabitants, why have it relate to citizenship any more than to property rights, or personal rights? If it was intended to fix the status of the inhabitants, as was the status of the inhabitants of the original states, then we are led into interminable difficulties by reason of the fact that these rights were different in the various states. The personal rights of the inhabitants of the original states, with reference to the elective franchise, are collated in *Minor v. Happersett*, 21 Wall., 172, by which it will be seen that they were not alike in any two of such states.

It may be suggested, however, that the inhabitants of the original states became, *ipso facto*, citizens of the United States. The reason of that was that the people of the original states were the persons who associated themselves

together to form a nation and consequently were its orig-
inal citizens. (*Minor v. Happersett, supra.*) The inhab-
itants of Nebraska were not creating a new and independ-
ent government, and by the admission of Nebraska into
the Union they did not throw off their allegiance to a for-
eign power. The principle which fixed and determined
the status of the original state can have no application to
this case.

The language of the enabling act has no reference to
the status of the inhabitants of the original states at the
time the state came into the Union any more than it can
be said to have reference to the footing or the relative
rights of the original states at the time when a union of
states was formed. It is self-evident that no territory can
now be admitted into the Union as a state, with all the
rights and privileges which were possessed by the original
states when they came into the Union. This may be il-
lustrated by reference to the fourteenth amendment to the
constitution of the United States, which, since its adoption,
forbids the states from exercising powers and privileges
which the original states could exercise at the time the Fed-
eral Union was formed. It is not an answer to this illus-
tration to say that Nebraska was admitted into the Union
before the adoption of the fourteenth amendment, because
we find substantially the same language in the enabling
acts by which new states have been admitted into the
Union since the adoption of that amendment. We think
it clear, both from the language of the enabling act and
from constitutional and political history, that the provis-
ions of the enabling act by which Nebraska was admitted
into the Union on an equal footing with the original states
must be used in the present tense, that is to say, was ad-
mitted with the same relative rights which the original
states held under the constitution at the date Nebraska was
admitted. If this view be correct, the words "equal foot-
ing" could not be construed as naturalizing all aliens who

were then inhabitants of the state, for the reason that aliens residing at that time within the limits of the original states were not citizens of the United States.

If it be true that the admission of a state naturalizes all aliens who were inhabitants of the territory at the time, then all that need be done by newly arrived immigrants to be transformed from alienage into citizenship, would be to take up their abode in a territory prior to its admission as a state into the Union. Congress foresaw the danger attending the naturalization of aliens before they had acquired a knowledge of the constitution and laws of our country, and consequently required a residence for a period of five years and, in addition to that, proof should be taken before a proper court that they were of good moral character and attached to the principles of the constitution of the United States, before they could be admitted to citizenship. This policy of our government would be entirely overturned by holding that aliens became citizens by the mere admission of a territory as a state. This rule would admit to citizenship foreigners who do not possess the qualifications to be admitted to American citizenship and that, too, without their consent.

The eighth section of the act of congress, approved February 22, 1889, which enabled the inhabitants of the Dakotas, Montana, and Washington to form constitutions and state governments and to be admitted into the Union, provides: "And if the constitutions and governments of said proposed states are republican in form, and if all the provisions of this act have been complied with in the formation thereof, it shall be the duty of the president of the United States to issue his proclamation announcing the result of the election in each, and thereupon the proposed states which have adopted constitutions and formed state governments as herein provided shall be deemed admitted by congress into the Union, under and by virtue of this act, on an equal footing with the original states, from and after

State, ex rel. Thayer, v. Boyd.

the date of said proclamation." This language is, in substance, the same as that contained in the enabling act by which Nebraska became a state. The necessary conclusion from the rule of construction contended for by respondent in this case would make the Chinese residing in the Dakotas, Montana, and Washington, when those states were admitted into the Union, citizens of the United States, while the courts have uniformly held that the Chinese were not proper subjects for naturalization under our present laws.

If we were to give to the admission of Nebraska as a state into the Union force and effect of a treaty or cession between the United States and the territory of Nebraska, still it could not control the present case, or the citizenship of the respondent, for the reason that he was born in Ireland of alien parents and was a subject of the queen of Great Britain and Ireland at the time of the admission of Nebraska as a state. His political relationship to this foreign power could not be made subject to any compact between Nebraska and the United States to which Great Britain was not a party. (*Tobin v. Walkinshaw*, 1 McAllister, 186.)

The opinion which we hold is supported by other sections of the enabling act. Section 13 provides that the "laws of the United States, not locally inapplicable, shall have the same force and effect within the said state as elsewhere within the United States." The naturalization laws of the United States were not, and are not, locally inapplicable to the state of Nebraska. These laws were enforced in the state of Nebraska, and, if so, there is no reasonable escape from the proposition that aliens must comply therewith in order to become citizens of the United States.

Section 1 of the enabling act provides "that the inhabitants of that portion of the territory of Nebraska included in the boundaries hereinafter designated be, and

46

they are hereby, authorized to form for themselves a constitution and state government, with the name aforesaid, which state, when so formed, shall be admitted into the Union as hereinafter provided." In the title the subject of the act is designated "the people" of Nebraska; in the purview, the "inhabitants." We know that the framers of the act, when they used these terms, did not mean all of the people, nor all of the inhabitants, then domiciled in Nebraska. In this connection attention is called to the act of congress of May 30, 1854, usually called the organic act. At the date of its passage there were no people nor inhabitants of Nebraska upon whom said act was designed to operate, but it was those thereafter to become domiciled there for whose benefit the said organic act was designed. Section 5 of said act provides "that every free white male inhabitant above the age of twenty-one years, who shall be an actual resident of said territory, and shall possess the qualifications hereinafter prescribed, shall be entitled to vote at the first election and shall be eligible to any office within said territory; but the qualification of voters and holding office, at all subsequent elections, shall be such as shall be prescribed by the legislative assembly; *Provided*, That the right of suffrage and of holding office shall be exercised only by citizens of the United States, and those who shall have declared on oath their intention to become such, and shall have taken an oath to support the constitution of the United States and the provisions of this act."

The qualifications of voters and of holding office in said territory remained substantially the same as above established by the organic act, at the date of the passage of the enabling act, and of the actual admission of Nebraska into the Union as a state, the legislative assembly having prescribed no different rules, except upon some points not material to the present inquiry.

When it is borne in mind that the sole purpose of the

enabling act was to invite and enable Nebraska to form for herself a constitution and become admitted into the Union as a state, it is obvious that this invitation would be addressed to those in whom the law had vested the power and the right to put the political power of the territory in motion and to control its action to the accomplishment of the purpose in hand. Who were they but those in whom the elective franchise had been vested by the organic law and wisely left by the "legislative assembly"? The "people of Nebraska," then, mentioned in the title, and the "inhabitants" mentioned in the first section, are the free white male inhabitants above the age of twenty-one years, actual residents of the territory, citizens of the United States, and those who have declared on oath their intention to become such, and shall have taken an oath to support the constitution of the United States. Why should any other than these have been mentioned or intended? None others were allowed to vote for representatives to form a convention to draft a constitution for the proposed state, nor to vote upon the acceptance or rejection of such constitution as might be formed by such convention. This is made plain by reference to provisions of section 3 of the enabling act, which provides "that all persons qualified by law to vote for representatives to the general assembly of said territory shall be qualified to be elected ; and they are hereby authorized to vote for and choose representatives to form a convention, under such rules and regulations as the governor of said territory may prescribe, and also to vote upon the acceptance or rejection of such constitution as may be formed by said convention," etc.

Persons of foreign birth residing in the territory of Nebraska, who had not declared their intention to become citizens of the United States, and taken an oath to support the constitution of the United States, were as powerless to make a constitution and government of the new state of Nebraska as though they had remained in the country of their birth.

But it is claimed that the invitation of the enabling act was extended to all the inhabitants of the territory, including unnaturalized foreigners, who had neither declared their intention to become citizens nor taken an oath to support the constitution of the United States, to take part in the formation of a constitution and state government, and they having done so, it is argued that they became citizens of the United States without oath of allegiance to the United States, or of abjuration to their mother country, simply by having taken part in the formation of the constitution and state government; in other words, that they came in with the state.    We have seen that this class of persons were not recognized as possessing any political status in the said territory whatever.    They could not legally vote at any election, nor were they entitled to hold any public office.    The legislative assembly, while possessing the power to confer certain political rights upon this class of persons, never exercised it, but, on the contrary, at its first session enacted a criminal code, section 131 of which  provided that "if any person willfully vote who  *   *   *  is not a citizen of the United States, or who is not duly qualified from other disability to vote at the place where and time when the vote is to be given ; he shall be fined in a sum not exceeding three hundred dollars or imprisoned in the county jail not exceeding one year."    This law was subsequently amended, and at the date of the admission of Nebraska into the Union as a state it stood as follows: "Sec. 38. Any person who shall vote in this territory  *   *   *, who is not a citizen of the United States, or declared his intention to become such, as provided by law, he knowing the same, shall, on conviction thereof, be imprisoned in the penitentiary and be kept at hard labor not less than six months nor more than three years."    (Revised Statutes of Nebraska Territory, 1866, p. 147.)

Can it be supposed that laws would have been kept in force for twelve years denying to foreigners, who had not

declared their intention to become citizens of the United States, the right to vote, and providing a punishment against them should they exercise such right, if it had been the law that upon the admission of Nebraska as a state all non-declaring foreigners residing in the territory were by the mere force of such admission, and, whether they desired it or not, became full fledged citizens of the United States? Most certainly not. It can be imagined that had the organic act recognized non-declaring foreigners who might be domiciled in the territory then being organized as voters therein and entitled to take full part in all its political affairs, or had the legislative assembly thereof, as it was probably empowered to do by such organic act, conferred the right to vote and hold office upon such foreigners, then upon the enactment by congress of a law to enable the "people," the "inhabitants," of such territory to form a constitution and state government, and for its admission into the Union, that these words, the "people" and the "inhabitants" were meant to embrace such foreigners, but where, as in this case, such foreigners had been, throughout the legislation of congress in reference to the territory, and throughout the legislation of the territory itself, denied all participation in the affairs of the territory, we do not think that in the use of the terms congress intended to invite or enable any to participate in the formation of a constitution and state government who had been thus excluded, but only such as could vote for delegates to a constitutional convention without violating the laws of the territory or subjecting themselves to criminal prosecution.

The view which we have expressed, to the effect that the inhabitants of the territory did not become citizens of the United States by the admission of such territory as a state, is sustained by judicial decisions. In *McKay v. Campbell*, 2 Sawyer, 125, it appears that McKay was born an alien. He was an inhabitant of Oregon at the time that territory

was admitted as a state into the Union, and afterwards claimed to be a citizen of the United States. The court held that he could not claim citizenship except through naturalization, and further held that the treaty of 1846 did not make him a citizen of the United States, and that there was nothing in the treaty that operated as a naturalization of inhabitants. We quote from the opinion: "The plaintiff, being the child of an unnaturalized citizen, and unnaturalized himself, cannot claim to be an American citizen, except upon the single ground that he was born upon the soil of the United States. Nothing that has happened since his birth can add to or take away from the strength of his claim.". After the birth of the plaintiff McKay, and during his residence in Oregon, that territory had been admitted into the Union as a state, without an enabling act it is granted, but will any one contend that she was for that reason any the less admitted into the Union upon an equal footing with the original states, or that Oregon is not to-day upon an equal footing in all respects with Nebraska? The admission of Oregon as a state, a like event which, it is claimed, made citizens of all aliens domiciled in Nebraska, was thus declared by the court as not adding to the rights of a person born in the allegiance of a foreign power to a claim of American citizenship.

*The State v. Primrose*, 3 Ala., 546, is exactly in point. The defendant was indicted in the circuit court of Mobile, for a libel; and pleaded in abatement that one of the grand jurors, by whom the indictment was returned, was not a citizen of the United States, but an alien. The juror was born in Ireland and came to Louisiana in 1811, where he remained until after the admission of Louisiana into the Union, and in the year 1814 he removed to the state of Alabama, where he was residing when he served as a grand juror. He had never been naturalized under act of congress, but it was claimed that as he was an inhabitant of the territory of Louisiana when it was admitted into the

Union, he thereby became a citizen of the United States. Mr. Justice Ormond in delivering the opinion of the court says :

"The question to be determined is, whether the fact that a person was an inhabitant of the territory of Louisiana, previous to its admission into the Union, by virtue of the act of congress of the 20th of February, 1811, will constitute such person a citizen of the United States.   This act, which was to enable the people of the territory of Orleans to form a constitution and state government, and for the admission of such state into the Union, on an equal footing with the original states, authorizes the '*inhabitants*' of the territory to form for themselves a constitution and state government.

"As the citizenship of the juror is supposed to flow from his being an *inhabitant* of the territory of Louisiana, at the time of the passage of the act of congress of 1811, previously cited, it becomes necessary to consider the precise import of a term, from which such consequences are to arise.   By the term, *inhabitant* of a place, or country, we understand one who has his domicile, or fixed residence there, in opposition to one who is a mere sojourner or temporarily resident in the place, or country. (Bouvier's Law Dic., 504 ; 1 Dall., 480).   It by no means, however, follows, that an inhabitant is a subject or citizen ; a foreigner, permanently resident, is as much an inhabitant as if he were a citizen or subject.

"By the term inhabitants, therefore, in this act was merely meant the mass constituting the body politic, who were authorized to form a state constitution preparatory to admission into the Union.   It certainly was not the intention of congress, either in this or in any of the other acts for the admission of new states into the Union, to do more than to prescribe the terms on which such state might be admitted.   That it was not intended by the act to confer citizenship is conclusively shown by the second section

of the act prescribing the qualifications of the voters for representatives to the convention which was to form the state constitution. They were required to be free white male citizens of the United States, having resided one year in the territory and paid taxes. Now, if the intention had been that, by the admission of the state into the Union, all the inhabitants became citizens of the United States, there would have been no propriety whatever in confining the elective franchise to those who were then citizens.

"The acts for the admission of Louisiana into the Union does not differ in any important particular from any of the other acts of congress, passed for the same purpose, before and since. The act for the admission of Alabama into the Union is precisely similar, and if the pretension set up is well founded, as the juror was an inhabitant of Alabama before and at the time of its admission into the Union, there would be no necessity to resort to his residence in Louisiana to establish his citizenship, unless the fact that the territory constituting the state of Louisiana was acquired by cession since the formation of the federal government affects the question. But we apprehend that the utmost which could be claimed for the residents of states thus circumstanced would be that they should be placed on the same footing with those residing in states formed from the public domain which belonged to the states at the formation of the federal compact."

We have carefully examined the two earlier cases in Louisiana, *U. S. v. Laverty et al.*, 2 Martin, 733 *, and *Desbois' Case*, 3 Martin, 185 *, which announce a contrary doctrine, but we cannot accept the reasoning therein to be sound. These cases assume as an accepted proposition that the admission of a state made the inhabitants thereof citizens of the United States. This assumption being not well grounded in reason, and without judicial precedent, we do not feel bound to follow. It is a matter of common knowledge that aliens residing in the territory of Nebraska,

who had declared their intention to become citizens of the
United States, completed their naturalization after the state
was admitted to the Union, and those who, although in-
habitants of the territory at the time, had not then declared
their intention to become citizens of the United States,
after the admission of the state, respectively, at their sev-
eral convenience, proceeded to declare such intentions be-
fore the proper officers, and after the expiration of the
prescribed time, to complete their naturalization in some
one of the courts having jurisdiction.  The same practice
has uniformly prevailed in other states, so far as our knowl-
edge extends.  All this would have been unnecessary if the
admission of the state into the Union had the effect of ad-
mitting all aliens to become citizens of the United States.

*Cryer v. Andrews,* 11 Tex., 170, *Barrett v. Kelly,* 31 Id.,
476, and Opinions of the Attorneys General, vol. 13, p.
397, are to the effect that all persons who were citizens of
the republic of Texas at the date of its annexation to the
United States, became citizens of the United States by
virtue of the collective naturalization effected by that act.
There can be no doubt that by the merger of the republic
of Texas in the United States, in 1845, the allegiance of
the inhabitants of Texas was transferred to the government
of the United States.  At the time of the annexation of
Texas she was an independent republic, and by the union
of the two governments the citizens of Texas became citi-
zens of the United States.  But it is evident that such
doctrine is not applicable here, for the reason that the terri-
tory of Nebraska, at the time it became a state, sustained
an entirely different relation to the government of the
United States than that of the republic of Texas at the
date of its annexation.

It was not supposed by the framers of our present con-
stitution, nor the electors of the state who voted on the
question of its adoption or rejection, that the alien inhabi-
tants of the United States, who were in the territory at

the date of its admission into the Union as a state, became citizens of the United States by such admission. A citizen of the United States was definitely understood and accepted by everyone to be a person who became such by reason of his birth, or a person of foreign birth who has been duly naturalized under the provisions of the uniform rule of naturalization established by congress. This is clearly the meaning that should be given to the words "citizens of the United States," as used in section 2 of article 5 of the constitution.

It is alleged in the information, and admitted by the answer that the respondent was an alien by birth. His original status is therefore presumed to continue until the contrary be shown. (*Haunstein v. Lynham,* 100 U. S., 483.) Sufficient facts are not alleged in the answer to show that he became a citizen of the United States two years prior to the last general election. We are, therefore, forced to the conclusion that he was at the date of the election ineligible to the office of governor. It is proper to state in this connection that the facts set up in the answer show that the respondent has for many years honestly believed he was a citizen of the United States, and that his citizenship had never been questioned prior to November last. In holding as we do, that he is not legally entitled to exercise the duties of the office of governor, we are but giving force and effect to a plain provision of our state constitution, which we have no right to disregard or refuse to enforce.

We come now to the consideration of the question, Is the relator entitled to the office of governor? The determination of this point involves the construction of sections 1 and 16 of article 5 of the constitution, which are as follows:

"Sec. 1. The executive department shall consist of a governor, lieutenant governor, secretary of state, auditor of public accounts, treasurer, superintendent of public instruction, attorney general, and commissioner of public lands

and buildings, who shall each hold his office for the term of two years from the first Thursday after the first Tuesday in January next after his election, and until his successor is elected and qualified," etc.

"Sec. 16. In case of the death, impeachment, and notice thereof to the accused, failure to qualify, resignation, absence from the state, or other disability of the governor, the powers, duties, and emoluments of the office for the residue of the term, or until the disability shall be removed, shall devolve upon the lieutenant governor."

The provisions of the first section are plain and unambiguous. It provides that the governor shall hold his office for two years, "and until his successor is elected and qualified." If section 1 stood alone it could not be successfully disputed that it was not only the privilege, but the duty of the governor to hold the office until his successor shall be duly elected and qualified. (*People v. Osborne*, 7 Col., 605; *Tappan v. Gray*, 9 Paige, 506; *People v. Bissell*, 49 Cal., 407; *People v. Whitman*, 10 Id., 38; *State v. McMullen*, 46 Ind., 307; *State v. Lusk*, 18 Mo., 333; *Commonwealth v. Hanley*, 9 Pa. St., 513; *State v. Jenkins*, 43 Mo., 261; *State v. McMillen*, 23 Neb., 389; *Carr v. Wilson*, 32 W. Va., 419.)

Under the provisions of section 16, quoted above, the duties of the office of governor devolve upon the lieutenant governor in certain contingencies, among which are the failure of the governor elect to qualify, and disability of the governor. The words "other disability," as used in the section, have no reference to the ineligibility of the person to be elected to the office, but were intended by the framers of the constitution to cover any disability of the governor not specifically enumerated in the section, occurring after the commencement of his term of office. The failure to elect a governor, on account of the ineligibility of the person receiving the highest number of votes for the office, is not a disability of the governor.

This section also provides, in effect, that in case the person elected governor fails to qualify, the lieutenant governor shall act. By "failure to qualify" is meant failure to give the bond and take the oath of office required by the constitution. It was intended to apply to a case where a person possessing the constitutional qualifications to hold the office has been elected but does not qualify. It cannot be said that there has been a failure to qualify where no person has been elected. This construction gives effect to the language of section 1 of article 5 of the constitution, which provides that the governor shall hold his office "until his successor is elected and qualified." When there is no person elected, the governor holds over. It is a familiar rule governing the construction of a constitution that effect, if possible, must be given to all its provisions.

A similar question was decided by the court of appeals of Virginia in *Ex parte Lawhorne*, 18 Gratt., 85. The report of that case shows that Francis Pierpont was elected and qualified as governor of that state for the term of four years from the 1st day of January, 1864. On the 13th day of January, 1868, no successor to him having been elected or qualified, Governor Pierpont granted a full and immediate pardon to James Lawhorne, who was then confined in the penitentiary under a sentence for grand larceny. The superintendent of the penitentiary refused to release him on the ground that Pierpont's term of office had expired on January 1, 1868. Lawhorne applied to the court for a writ of *habeas corpus.*

Section 22 of article 6 of the constitution of Virginia provides that "judges and all other officers, whether elected or appointed, shall continue to discharge the duties of their respective offices, after their term of service have expired, until their successors are qualified."

Section 1 of article 5 of that constitution fixes the term of governor at four years, commencing on the first day of

January succeeding his election, and makes him ineligible to the same office for the term next succeeding that for which he was elected.

Section 8 provides for the election of a lieutenant governor at the same time, and for the same term as the governor.

Section 9 provides that " In case of the removal of the governor from office, or of his death, failure to qualify, resignation, removal from the state, or inability to discharge the powers and duties of the office, the said office, with its compensation, shall devolve upon the lieutenant governor; and the general assembly shall provide by law for the discharge of the executive functions in other necessary cases."

The court held that the constitution made it obligatory upon Pierpont to discharge the duties of the office of governor until his successor was qualified, and that the pardon granted by him was valid.

It is insisted by counsel for the respondent that Thayer's term of office expired when Boyd was elected and qualified. The proposition assumes the question in dispute, Was Boyd duly elected? The inquiry is not whether he received a plurality of votes, but did he have the qualifications to be elected? We have already given a negative answer to this. Elected, as used in the constitution, means the choosing of a person eligible to be chosen.

It is argued by counsel for the respondent that the relator is not entitled to hold the office because it does not appear that he requalified within ten days after the time when his successor should have qualified.

Section 17, chapter 10, Comp. Stats., relating to "bonds and oaths," reads as follows:

"Sec. 17. When the incumbent of an office is re-elected or re-appointed he shall qualify by taking the oath and giving the bond as above directed; but when such officer has had public funds or property in his control, his bond shall not

be approved until he has produced and fully accounted for such funds and property; and when it is ascertained that the incumbent of an office holds over by reason of the non-election or non-appointment of a successor, or of the neglect or refusal of the successor to qualify, he shall qualify anew within ten days from the time at which his successor, if elected, should have qualified."

Section 5 provides that the official bonds and oaths of all officers elected at a general election shall be filed in the proper office on or before the first Thursday after the first Tuesday in January following the election.

Section 15 provides in substance that if a person elected or appointed to an office fails to qualify within the time provided by law, his office shall, *ipso facto*, become vacant and the vacancy shall be filled by election or appointment.

The provisions of section 15 were not intended by the legislature to apply to a case where the incumbent of an office holds over on account of the failure to elect a successor, but have reference to cases where the person elected to a public office has never taken the oath and given the bond required by law, and who has never entered upon the discharge of the duties of the office. Hold-over officers are governed and controlled by section 17 above quoted. It requires such an officer to qualify anew within a specified time, when it is ascertained that he holds over by reason of the non-election or non-appointment of a successor, or when the successor fails to qualify. Ascertain is "to find out or learn for a certainty, by trial, examination or experiment." How could Thayer determine that no successor was elected? The returns of the election at which a successor was to be chosen showed that the respondent received a plurality of the votes. Whether he was elected depended upon whether the respondent was eligible to be elected. That question could be determined only by judicial inquiry, and when, upon trial, it is ascertained that the relator is entitled to hold over on account of the ineligi-

bility of the defendant, the relator is required to requalify. This construction also gives effect to section 711 of title 23 of the Code of Civil Procedure relating to proceedings by *quo warranto,* which provides that "If judgment be rendered in favor of such claimant, he shall proceed to exercise the functions of the office, *after* he has qualified as required by law."

It follows that the answer fails to state a defense to the information and the demurrer is sustained. A judgment of ouster must be entered against the respondent.

JUDGMENT OF OUSTER.

COBB, CH. J., concurs.

MAXWELL, J., dissenting.

Leave was given the relator to file an information in his own behalf in an action of *quo warranto,* to determine his right to continue in the office of governor of the state of Nebraska from the first Thursday after the first Tuesday in January, 1891, for the period of two years, upon the alleged ground that the defendant was not a citizen of the United States for two years prior to the election in November, 1890, and, therefore, not eligible to the office of governor of the state.

The court in making the order allowing the relator to file his information, qualified it so as to permit the lieutenant governor to intervene should the court, on the final determination of the case, find that the defendant was not eligible to the office, and it would thus become necessary to determine who should succeed him, whether the relator or the lieutenant governor.

In his answer the defendant "admits that the attorney general of this state refuses to prosecute this action, and protests and insists and avers the fact to be that the information herein is insufficient in law to require the respond-

State, ex rel. Thayer, v. Boyd.

ent to make answer thereto; for that it does not show that said John M. Thayer has any right or title to the said office of governor of Nebraska, or that he has any right, title, or authority to institute, maintain, or prosecute this action; and for that said information does not state facts sufficient to constitute a cause of action.

"Respondent admits the allegations of the first, second,. third, fourth, and fifth paragraphs of the information, except as hereinafter shown.

"Respondent shows to the court that said John M. Thayer was, at the regular state election held in the state of Nebraska in November, A. D. 1888, elected to the office of governor of this state for a term thereof commencing in January, 1889, and that upon the canvass of the votes cast at said election, he was duly declared to be so elected; that the term of said office is fixed by the constitution to commence on the first Thursday after the first Tuesday in January succeeding the election, and continues for a period of two years and until his successor shall be elected and qualified; that the laws of Nebraska at all the times herein mentioned provided that if a qualified incumbent of the office holds over by reason of the non-election or non-appointment of a successor, he shall qualify anew within ten days from the time at which his successor, if elected, should have qualified by taking the oath of office, executing it in having approved and filed for record his official bond in the sum of fifty thousand dollars, conditioned for the faithful performance of the duties of the office, as by law required; that the said John M. Thayer continued as the actual incumbent of said office, down to the time when this respondent qualified as governor of this state on the 8th day of January, 1891, which was the first Thursday after the first Tuesday in January succeeding the election in question; that the said John M. Thayer has never since the 8th day of January, 1891, qualified anew as governor of the state of Nebraska; that he has not since that

date taken or filed the official oath required by law, nor has he had his official bond executed, or approved, or filed for record, as by law required, to qualify him anew if no party was elected to hold said office of governor from and after the said 8th day of January, as he alleges in his information, but which respondent denies; and, in this behalf, further alleges the fact to be that after the said 8th day of January, 1891, the respondent entered into the office of governor of the state of Nebraska, and the said John M. Thayer from that time and thereafter wholly surrendered, abandoned, and removed from said office, and has not since, in any manner, directly or indirectly, occupied or possessed the same, or assumed, or pretended to assume, to perform any of the functions thereof, and wholly surrendered same and vacated said office.

"Answering the sixth paragraph of said information the respondent admits that after his election to the said office and the canvass of the returns, and after he had been declared elected to the said office by the speaker of the house of representatives, in the presence of a majority of the legislature, as required by law, he, on the 8th day of January, 1891, took the oath of office, executed and filed his official bond, did all other acts and things required by law of him to be done to qualify and entitle him to enter into the possession, use, and employment of said office and to discharge the duties thereof; and the respondent denies that he has usurped or invaded the said office, or unlawfully attempted at any time to hold said office and to perform the duties thereof, but avers the fact to be that at and from the commencement of the term of his said office, from January 8, 1891, he has been and now is the duly elected and qualified governor of the state of Nebraska, in the quiet, legal, and actual possession and enjoyment of said office and discharging its duties; that he has been recognized so to be by all of the departments and officers of the state government; that the said John M. Thayer ceased

47

to be the incumbent of said office in law and in fact with the expiration of the 8th day of January, 1891, and prior to the commencement of this action.

"Answering the eighth paragraph of said information the respondent denies all the allegations thereof, except that he was born in Ireland of alien parents in the year 1834; that he was brought to this country when about ten years of age by his father Joseph Boyd, who settled about the year 1844, in Belmont county, Ohio, where he resided for several years, and thereafter removed to Zanesville, Muskingum county, Ohio, where he has ever since resided.

" Respondent also admits that his father, on or about March 5, 1849, when respondent was about fourteen years of age, declared his intention to become a citizen of the United States, and to renounce and abjure forever all allegiance and fidelity to every foreign prince, potentate, state, and sovereignty whatever, and particularly the queen of Great Britain and Ireland; and that the alleged exemplification of the record thereof, copied in said information, respondent believes is a true copy.

"Answering the eighth paragraph of said information, respondent says he admits the facts therein alleged, except as in this answer otherwise averred, but denies the conclusions of law and facts therein stated; that his father for forty-two years last past has enjoyed and exercised all of the rights, immunities, and privileges, and discharged all the duties of a citizen of the United States and of the state of Ohio, and was, in all respects and to all intents and purposes, a citizen of the United States and of the state of Ohio, at all times disclaiming and abjuring allegiance to every foreign prince, potentate, state, or sovereignty; that all of said times said Joseph Boyd behaved as a man of good moral character, attached to the principles of the constitution of the United States and well disposed to the good order and happiness of the same; that when the said Joseph Boyd settled in the state of Ohio, as

aforesaid, it was his *bona fide* intention to make the United
States his permanent residence; that at that time he did in
fact disclaim, renounce, and abjure all allegiance and fidel-
ity to the queen of Great Britain and Ireland, and to
every other foreign prince, potentate, state, and sovereignty,
and for forty years acted in the belief that he was a citizen
of the United States, all said times exercising the elective
franchise without question or challenge, voting for all offi-
cers of the state and federal governments the same as a
native-born citizen of the United States and of the state
of Ohio; that about the year 1870 said Joseph Boyd was
elected to the office of justice of the peace in said Muskin-
gum county, Ohio, and thereupon took an oath to support
the constitutions of the United States and of the state of
Ohio, and for several years held said office, exercising all
the rights, franchises, powers, and duties of said office, and
has for years last past held office under the constitution
and laws of Ohio, to-wit, weighmaster in the city of
Zanesville, which office he now holds; that he was in-
formed by his father as early as the year 1855 that he, the
said Joseph Boyd, was a citizen of the United States and
entitled in law and in fact to all the rights, privileges, and
immunities of a citizen of the United States and of the
state of Ohio, and that ever since said time this respondent
has so believed and accepted the fact so to be, and never
heard the fact challenged or questioned till after he was
elected to the office of governor of this state in 1890; that
he did, upon arriving at the age of twenty-one years, exer-
cise the election franchise in said Muskingum county,
Ohio, in the fall of 1855.

   " The respondent further alleges, on information and be-
lief, that prior to October, 1854, his father did, in fact,
complete his naturalization in strict accordance with the
acts of congress known as the naturalization laws so as to
admit and constitute him a full citizen of the United States
thereunder, he having exercised the rights of citizenship

herein described, and at said time informed respondent that such was the fact; that when his father applied to be registered in Ohio in October, 1890, under a new law, he was required to produce his citizenship papers, and being unable to find all thereof, he appeared before said court of common pleas of Muskingum county at the October term thereof, 1890, and the proceedings described in the ninth paragraph of the information were had as therein set out, but respondent avers the fact to be, on information and belief, that in the matter of said proceedings said Joseph Boyd acted unadvisedly and ignorantly, the said last named proceedings being in that event unnecessary; that in the year 1856, at the age of twenty-two, he left his father's home in Ohio in the firm belief that he, respondent, was a citizen of the United States in law and in fact, to establish himself in life; that he went to the state of Iowa, where he resided for a few months.

"In the month of August, 1856, respondent removed to the territory of Nebraska, which was then to a large extent a wilderness, and settled in Douglas county, where he resided for two years, working at his trade as a carpenter, and in 1857 he was elected county clerk of said county, and took an oath to support the constitution of the United States, and the provisions of the organic act under which the territory of Nebraska was created. Respondent removed to what is now Buffalo county, near old Fort Kearney, which was then upon the extreme frontier, in the fall of 1858, where he engaged in the business of farming in the midst of great perils from hostile Indians, suffering years of extreme hardship. In 1864, at the time of the Indian outbreak in said vicinity, when the lives and property of settlers were destroyed or endangered, when many settlers were massacred, when hostile Indians killed cattle before the door of the home of his family, he volunteered his services as a soldier of the United States, which were accepted by the United States government, he

being sworn into its military service by order of General R. B. Mitchell; that he served as a soldier of the United States without compensation or reward, to protect the men, women, and children of the frontier, and to maintain the authority, honor, and flag of the United States government.

"In the year 1866 respondent was elected a member of the house of representatives of Nebraska to represent the counties of Buffalo and Hall; that he served as such officer in the following session of the legislature, to which was submitted the proposition of the congress of the United States to accept the first constitution of this state with the conditions imposed by the act of congress, known as the enabling act below named; that before entering upon the duties of said office he took the oath required by law and swore to support the constitution of the United States and the provisions of the organic act under which the territory of Nebraska was created.

"In 1868 respondent removed to Douglas county, where he has since resided.

"In the year 1871 respondent was elected by the electors of said county a member of the convention of the people of the state of Nebraska to form a state constitution, and, after taking the oath required by law to support the constitutions of the United States and state of Nebraska, in fact served as a member of said convention.

"In the year 1875 the respondent was elected by the electors of said county a member of the convention of the people of the state of Nebraska to form a constitution, which convention discharged that duty in the year 1875, which resulted in forming the constitution under which the government of this state has since existed; respondent, after taking the oath required by law to support the constitutions of the United States and of this state, in fact served as a member of said convention.

"In 1880 respondent was elected and acted as president of the city council of the city of Omaha.

"In 1881 respondent was elected mayor of the city of Omaha and served in said office for two years.

"In 1885 respondent was again elected to said office of mayor and served for two years, and before taking the office of mayor each of said times, respondent took an oath to support the constitutions of the United States and of the state of Nebraska.

"That during said period of over thirty years he has exercised the elective franchise in said territory and state of Nebraska, and enjoyed all the rights, privileges, and immunities of a citizen of the United States, and of said territory and state; that for over thirty-two years past he has been in fact and in law a citizen of the United States and of said territory and state; that neither the United States, nor the territory or state of Nebraska, has ever challenged his citizenship, or sought to oust him of the franchise actually enjoyed and exercised by him to be a citizen of the United States, and that it is not competent for this relator so to do; that if his said right and privilege of being a citizen of the United States is subject to challenge, it is solely for the United States, in its sovereign capacity, to challenge the same; that he was at the time of the election in question, and for more than two years prior thereto, eligible to be elected to and to hold said office of governor for the term in question; that in 1849 it was his *bona fide* intention to be a citizen of the United States, and that he then renounced and abjured forever all allegiance and fidelity to every foreign prince, potentate, state, or sovereignty whatever, and particularly the queen of Great Britain and Ireland; that during all the time since he has behaved as a man of good moral character, attached to the principles of the constitution of the United States and well disposed to the good order and happiness of the same, and all said times has absolutely renounced and abjured all allegiance and fidelity to every foreign prince, potentate, state, or sovereignty, and particu-

State, ex rel. Thayer, v. Boyd.

larly the queen of Great Britain and Ireland; that after his election as governor, and after he had learned for the first time that his citizenship had been questioned, and on December 16, 1890, he went before the district court of the United States for the district of Nebraska, for the purpose of removing all doubts that might arise thereafter in respect thereof, and by petition to said court represented to that court the facts necessary to be known in that behalf, touching his said history and citizenship of the United States, insisting therein that he was and had been for more than two years next preceding his election to the office of governor in November, 1890, a citizen of the United States, and also representing to said court that a question had been raised as to his said citizenship, whereupon said court, by its judgment, found, determined, and adjudged that he was in fact and law a full citizen of the United States, and respondent avers that he is, and for many years last past has been, a citizen of the United States within the meaning and requirements of the acts of congress of the United States.

"A copy of which petition, judgment, and record is hereto attached and made part of this answer.

"Respondent denies the allegations of the ninth, tenth and eleventh paragraphs of said information, except that he refuses to surrender said office of governor to the said relator and all other allegations of said information not hereinbefore admitted or specially answered.

"Wherefore, respondent prays to be hence dismissed with his costs in this behalf most wrongfully expended, and for such other and further relief as may be just and proper."

The relator demurred to the answer upon the ground that the facts stated therein are not sufficient to constitute a defense to the information.   In the argument on the demurrer the defendant contends that the remedy by contest is exclusive, and therefore the court has no jurisdiction.

In *State v. Marlow*, 15 O. St., 114, the supreme court of Ohio, in construing the constitution of that state and a statute passed in pursuance thereof in regard to contests, held that the remedy provided by statute was exclusive, and therefore an information in *quo warranto* would not lie. A few other cases to the same effect may be found.

We are of the opinion, however, that under our constitution the remedy by contest is not exclusive, and therefore that an information in a proper case may be maintained.

It will be observed that it is alleged in the answer that the relator fully surrendered, abandoned, and removed from said office and has not since, in any manner, directly or indirectly, occupied or possessed the same, or assumed, or pretended to assume, to perform any of the functions thereof, but wholly surrendered the same.

It is a fact well known that about the 20th of January, 1891, in order to prevent a scandal injurious to the good name of the state by having two persons endeavoring to act as governor thereof, the court, through its chief justice, stated to the relator that Governor Boyd was the acting governor to be recognized as such until the determination of this suit and that the relator would lose nothing by quietly leaving the building, and in case it should eventually be found that he was entitled to the office, his rights would be respected and enforced. It does not appear however, from the allegations, the precise date at which it is alleged the relator surrendered the office, etc. For aught that appears it may have been after the promise heretofore spoken of. Neither are the allegations as to abandonment of the duties of the office as explicit as they should be. This is subject to amendment if such amendment was necessary in the case.

The allegations as to the failure to file the bond and take the oath required by statute within ten days from the 8th day of January, 1891, are not necessary to be considered in this connection and will not be discussed. The al-

legation of the defendant "on information and belief that prior to October, 1854, his father did, in fact, complete his naturalization in strict accordance with the acts of congress known as the naturalization laws, so as to admit and constitute him a full citizen of the United States thereunder." This, in the opinion of the writer, is sufficient on demurrer to show that the father of the defendant, before the defendant was of the age of twenty-one years, had completed his naturalization, so that thereby the defendant became a citizen of the United States. It was unnecessary to allege this fact upon information and belief, as all that the law requires in verifying the answer is to state the facts as he believes them to be. The allegations that follow in regard to Joseph Boyd having exercised the right of citizenship are simply to show that after the year 1854, he regarded himself as being a citizen of the United States, and entitled to the exercise of the elective franchise, and he was so regarded by his neighbors. The further allegation, also in effect that, in consequence of a new registry law taking effect, he was unable to register, and, therefore, to vote, and was compelled to take out his second papers, although he had previously become a citizen of the United States, is of the same nature. These allegations being admitted by the demurrer would seem to be sufficient, if proved, to constitute a defense to the action.

If the relator desire a more definite statement he should have filed a motion for that purpose. We must remember that the son had no personal kowledge of the naturalization of his father, but was informed by him that he had been naturalized, and hence that the defendant was a citizen of the United States. Under such circumstances greater latitude should be allowed in pleading than where the party himself had been the actor in the case. My associates, however, deem the allegations too uncertain, and hence I acquiesce in their views. This defect, however, could, if necessary, be readily cured by positive allegations.

Third—It is contended on behalf of the defendant that he became a citizen of the United States by virtue of the several acts of congress admitting the state of Nebraska into the Union. I must confess that when the proposition was presented, and without an examination of the question, it did not seem to possess the importance which it now assumes. The act organizing the territory of Nebraska was approved on the 30th day of May, 1854. The provisions of the act are exceedingly liberal and evidently intended to invite permanent settlers into the territory. The territory at that time comprised substantially what has since been formed into five states.

On the 19th of April, 1864, congress passed an act to enable the people of Nebraska to form a constitution and state government and for the admission of such state into the Union on an equal footing with the original states Section 1 of the act provides:

"That the inhabitants of that portion of the territory of Nebraska included in the boundaries hereinafter designated be, and they are hereby, authorized to form for themselves a constitution and state government, with the name aforesaid, which state, when so formed, shall be admitted into the Union as hereinafter provided."

Upon the formation of the constitution and ratification of the same in the manner provided in the act, the president was authorized to issue his proclamation declaring the state admitted into the Union on an equal footing with the original states. In pursuance of this act a constitutional convention was elected and met in the city of Omaha on the 4th day of July, 1864. The territory at that time, contained not to exceed 30,000 people. It had furnished more than two regiments of volunteers who were then in the field. The war had cut off, or impeded to a great extent, the only means of communication with the commercial marts of the country, viz., the Missouri river; hence there was a stagnation of business and the territory was not in-

creasing in population to any extent. These things were felt by every member of the convention and it was the general opinion of the members and the general sentiment of the people of the territory that there was not sufficient population to justify the formation of a state government, and that if a constitution was framed and submitted to the people it would be overwhelmingly defeated. The convention, therefore, organized by the election of the father of the present lieutenant governor as president, and other officers, and by a unanimous vote adjourned *sine die.* Two years later, however, with the close of the war, the building of the Union Pacific railway and the flow of immigration into the territory, a desire was felt to form a state government, and thereupon the legislature prepared a constitution and submitted it to the people of the state at an election held on the 2d day of June, 1866. The preamble to this constitution is as follows: " We, the *people* of Nebraska, grateful to Almighty God for our freedom, in order to secure its blessings, form a more perfect government, insure domestic tranquility, and promote the general welfare, do establish this Constitution."

It will be observed that in the first section of the enabling act the inhabitants of what is now the state of Nebraska were authorized to form for themselves a constitution and state government, which in the preamble they assert that they do form. This constitution was adopted by a small majority and the first state legislature met at the city of Omaha on the 4th day of July, 1866, and after organizing proceeded to elect senators for the state, one of whom was the relator in this case. There was strong opposition in the legislature to the organization of state government, and in the house, consisting of thirty-nine members, but twenty were in favor of, while nineteen were opposed to, such organization, and in the senate, consisting of thirteen members, seven were in favor of, and six opposed to, state government.

As the act of 1864 had not been accepted at the time therein provided it became necessary for congress to pass an additional act admitting the state into the Union. The first section of that act is as follows;

"WHEREAS, On the 21st day of March, A. D. 1864, congress passed an act to enable the people of Nebraska to form a constitution and state government and offered to admit said state, when so formed, into the Union, upon compliance with certain conditions therein specified; and

" WHEREAS, It appears that the said people have adopted a constitution, which upon due examination, is found to conform to the provisions, and comply with the conditions of said act, and to be republican in its form of government, and that they now ask for admission into the Union: Therefore,

"*Be it enacted by the Senate and House of·Representatives of the United States of America in Congress assembled,* That the constitution and state government which the people of Nebraska have formed for themselves be, and the same is hereby, accepted, ratified, and confirmed, and that the said state of Nebraska shall be, and is hereby declared to be, one of the United States of America, and is hereby admitted into the Union upon an equal footing with the *original states in all respects whatsoever.*"

Congress thus construed the word " people " as a synonym with the word "inhabitants."

It will be observed that the act admitting Nebraska into the Union contains provisions which are exceedingly comprehensive. The constitution and state government "is hereby accepted, ratified, and confirmed, and the said state of Nebraska shall be, and is hereby,  *  *  *  admitted into the Union upon an equal footing with the original states in all respects whatsoever." I have been unable to find as strong language in an act admitting any other state into the Union, and the language is much stronger than that admitting the state of Texas, to which reference will hereafter be made.

It is necessary now to inquire how the original states were admitted into the Union.

The preamble to the constitution of the United States declares that "We, *the people* of the United States, in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessing of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States of America."

In *Minor v. Happersett*, 21 Wall., 165–67, the supreme court of the United States, in very clear language, points out who were citizens of the United States at the formation of the federal government. It is said:

"There cannot be a nation without a people. The very idea of a political community, such as a nation is, implies an association of persons for the promotion of their general welfare. Each one of the persons associated becomes a member of the nation formed by the association. He owes it allegiance and is entitled to its protection. Allegiance and protection are, in this connection, reciprocal obligations. The one is a compensation for the other: allegiance for protection and protection for allegiance.

"For convenience it has been found necessary to give a name to this membership. The object is to designate by a title the person and the relation he bears to the nation. For this purpose the words 'subject,' 'inhabitant,' and 'citizen' have been used, and the choice between them is sometimes made to depend upon the form of the government. Citizen is now more commonly employed, however, and as it has been considered better suited to the description of one living under a republican government, it was adopted by nearly all of the states upon their separation from Great Britain, and was afterwards adopted in the articles of confederation and in the constitution of the United States. When used in this sense it is understood as conveying the idea of membership of a nation, and

nothing more. To determine, then, who were citizens of the United States before the adoption of the amendment, it is necessary to ascertain what persons originally associated themselves together to form a nation, and what were afterwards admitted to membership.

"Looking at the constitution itself we find that it was ordained and established by 'the people of the United States,' and then going further back, we find that these were the people of the several states that had before dissolved the political bands which connected them with Great Britain and assumed a separate and equal station among the powers of the earth, and that had by articles of confederation and perpetual union in which they took the name of 'the United States of America,' entered into a firm league of friendship with each other for their common defense, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other against all force offered to or attack made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretense whatever. Whoever, then, was one of the people of either of these states when the constitution of the United States was adopted became, *ipso facto*, a citizen—a member of the nation created by its adoption. He was one of the persons associating together to form the nation, and was, consequently, one of its original citizens. As to this there has never been a doubt. Disputes have arisen as to whether or not certain persons, or certain classes of persons, were part of the people at the time, but never as to their citizenship if they were."

The same doctrine had previously been announced in *McIlvaine v. Coxe's Lessee*, 4 Cranch, 214, and other cases, and is stated by Kent, 2 Comm., pp. 1–2.

In *United States v. Laverty et al.*, in the district court of the United States, 3 Martin, 733, which seems to have arisen during the last war with Great Britain, where certain persons arrested as alien enemies claimed to be citizens

of the United States by virtue of the admission of the state of Louisiana into the Union, it is said: "It is well known that some of these persons have been discharged by one of the judges of the state, but as the marshal and many others are seriously impressed with a belief that they are not citizens, but aliens, it has been deemed proper to obtain the opinion of the judge of the United States."

It is contended by the attorney of the United States that congress alone has power to pass laws on the subject of the naturalization of foreigners, and that, by the constitution, it is declared that the rule for their admission must be uniform. On the other hand, it is said that congress has the power to admit new states into the Union; that this power is not inconsistent with nor repugnant to the other; that the first rule well applies where individual application is made for admission, but is not restrictive of the other power to admit at once great bodies of men, or new states into the Federal Union.

The power to admit new states is expressly given by the third section of the fourth article of the constitution; it has been frequently exercised, and on the 30th of April, 1812, Louisiana was admitted into the Union, upon the same footing with the original states. In what manner has this power been exercised with respect to other states? On the 30th of April, 1802, the inhabitants of the eastern division of the territory northwest of Ohio were authorized to form for themselves a constitution and state government; this was done, and they were afterwards admitted into the Union. Previous to their admission the people of that country were governed by what is commonly termed the Ohio ordinance; that the population consisted partly of citizens of the United States and partly of foreigners may be collected from the provisions of that instrument for their government; that a great body of aliens resided among them is known to many. It is declared that possessing a freehold of fifty acres of land, having

been a citizen of one of the states, and being resident in the district, or the like freehold, and two years' residence, shall be necessary to qualify a man as an elector. Here there are two descriptions of persons : First, citizens of the United States with a freehold and actual residence, and second, persons not citizens, with a freehold and two years' residence. Were they not all equally inhabitants ? and, in the act of admission, is there any distinction made? The inhabitants, then, who were authorized to form a state government for themselves, must have been all the real inhabitants of the country, citizens or foreigners, and after the admission of the state into the Union, must have equally participated in all its advantages, because if a party only were entitled to its benefit, all the inhabitants had not formed a government for themselves. Can we, for an instant, believe that a wise, just, and liberal government, like that of the United States, would invite any portion of people, who were enjoying self-government in a considerable degree, to place themselves in a situation where they would be entirely deprived of it ? I can have no doubt that all the inhabitants of the state of Ohio were admitted citizens of that state by their admission into the Union.

Let us then examine and discover, if possible, any difference between the case of that state and of this. Louisiana, it is said, was admitted under the treaty of Paris, by which it is stipulated that the inhabitants shall be incorporated into the union of the United States and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States. It is then contended by some that the word "inhabitants," used in the act of February, 1811, applies solely to those who were inhabitants in 1803.

On the 20th of February, 1811, congress passed an act "enabling the people of the territory of Orleans to form a state government." It commences by declaring that the

"inhabitants" of all that part of the country ceded under the name of Louisiana shall be authorized to form for themselves a state government. It then goes on and describes two classes of inhabitants: First, citizens of the United States, and all persons having in other respects the legal qualifications to vote for representatives in the general assembly. Those qualifications are the same as those of Ohio—two years' residence and a freehold for those who are not citizens. We here find no distinction between the old inhabitant and the new; the man who has been here two years and has fifty acres of land, let him be citizen or alien, is authorized to join in making a constitution for all the inhabitants of Louisiana. The law then evidently does not mean merely "the inhabitants at the date of the treaty," and it will be found that the only question in this case is, whether congress had a right to include any others than citizens in their act of admission.

I have already shown that they have exercised this right heretofore; that in the case of the state of Ohio it was not disputed, and it does not become us at this time to question it.

I shall now consider some of the arguments that have been urged by the district attorney and his colleague. Although an attempt was made to distinguish between the two classes of inhabitants (not originally citizens of the United States), yet, in truth, their arguments go as well to exclude the first as the last class. It is contended that the only mode by which an alien can be naturalized is by a compliance with the uniform rule; that this is the only constitutional mode; that the expression in the treaty that "the inhabitants shall be admitted according to the principles of the constitution," means according to the uniform rule required by the constitution. If so, the creoles of Louisiana are not citizens yet, for not one of them has complied with that law. But one of the gentlemen has observed: here is a treaty, and treaties are paramount. I

48

can never subscribe to the doctrine that treaties can do away with any part of the constitution. I will go as far as any one in supporting and observing them in anything not repugnant to it. If, then, the uniform system be the only constitutional one, any other must be unconstitutional, and, though introduced by treaty, is void. If this were the only constitutional mode I should tremble for the fate of the Louisianians; but, fortunately for them and for others, it is not the only one. The expression under the treaty is that they shall be admitted according to the principles of the constitution; that is, with the consent of congress, which shall be obtained as soon as possible; and it has been since given. By this construction every part is reconciled; and if congress, in their liberality, included others who have since settled in the country, they had a right to do so.

It is said that the law respecting alien enemies declares that they shall all be apprehended unless actually naturalized; and it is contended that the only actual naturalization is by the uniform rule. This does not follow; if it did, there is scarcely a creole who, in case of a war with France or Spain, would not be subject to its penalties, for none of them have complied with it. The government has a right, by treaty or by the admission of a new state, to naturalize, and such naturalization is equal to the other.

The same question arose in *Desbois' Case*, 2 Martin's Reports, 185, and the same conclusion reached. In construing the meaning of the word "inhabitants" it is said (p. 182): "The act of congress authorizing the formation of the constitution of this state (10 Laws U. S., 322) was almost literally copied from that which authorized that of the state of Ohio (6 Laws U. S., 120). In the first section of the latter the *inhabitants* of the eastern division of the territory northwest of the river Ohio are authorized to form for themselves a state constitution. In the fourth section the persons entitled to vote for members of the

convention are described : First, all male citizens of the
United States; next, all other persons having, etc.  The
word *inhabitants*, in the first section of this act, must be
taken *lato sensu*, it cannot be restrained so as to include
citizens of the United States only, for other persons are
afterwards called upon to vote.  There is not any treaty, or
other instrument which may be said to control it.  Every
attempt to restrict it must proceed on principles, absolutely
arbitrary.  If the word is to be taken *lato sensu* in the act
passed in favor of the people of one territory, is there any
reason to say that we are to restrain it, in another act,
passed for similar purposes, in favor of the people of an-
other territory ?".

The cases above cited are referred to with approval by
the attorney general of the United States in volume 13 of
Official Opinions, p. 397, who also cites Wheaton's Inter-
national Laws by Lawrence, p. 897, in support of the
proposition, and the cases cited have not been overruled.

The only case we have found holding a contrary doctrine
is *State v. Primrose*, 3 Ala., 546.  In that case one of the
grand jurors who found an indictment, was a native of
Ireland and settled in Louisiana in 1811 and three years
later removed to Mobile, Ala.  The court holds in effect
that he was not within the terms of the act of congress ad-
mitting Louisiana into the Union.  The most favorable
view that can be taken of the case is, that the opinion was
written off-hand and without any previous investigation of
the questions involved.  On the main point not a single
authority is cited nor are the principles discussed upon
which other courts have placed a construction upon the
word "inhabitants."  At the close of the opinion the judge
frankly says that he had not seen the decisions of the
Louisiana courts and therefore those cases had no influ-
ence on the judgment of the court.  So far as we have
observed, after a very careful examination, the doctrine of
that case has not been approved in a single instance.

In *American Ins. Co. v. Canter*, 1 Peters, 542, the supreme court of the United States said: " On the 2d of February, 1819, Spain ceded Florida to the United States. The sixth article of the treaty of cession contains the following provision: 'The inhabitants of the territories which his Catholic majesty cedes to the United States by this treaty shall be incorporated in the Union of the United States as soon as may be consistent with the principles of the federal constitution, and admitted to the enjoyment of the privileges, rights, and immunities of the citizens of the United States.' This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States."

There are other decisions of the supreme court of the United States affirming this doctrine, and the same rule is recognized by congress in contested elections.

In the report of the committee on elections in the case of Mr. Levy, delegate from the territory of Florida (Contested Election Cases, 2d Session 38th Congress, 41), it is said: "The fourth section of the act of congress of April 14, 1802, secures to the infant children of persons naturalized, the benefit of their parents' naturalization, provided such children were at the time living in the United States. It matters not whether the naturalization be effected by act of congress, by treaty, *or by the admission of new states*, the provision is alike applicable. The condition of the parent is impressed upon the child." This right exists under the war and treaty-making powers of the government, and the right to control the territory and property of the United States and admit new states into the Union.

There are three modes, therefore, by which citizenship may be acquired: First, birth; second, proceedings in a court of record; third, by treaty or act of congress admitting new states. The third proposition will be more fully illustrated by a reference to the admission of the state of Texas into the Union.

On the 1st day of March, 1845, a resolution was adopted by congress as follows: "That congress doth consent that the territory properly included within and rightfully belonging to the republic of Texas may be erected into a new state, to be called the state of Texas, with a republican form of government, to be adopted by the people of said republic, by deputies in convention assembled, with the consent of the existing government, in order that the same may be admitted as one of the states of this Union." (5 U. S. Stats. at Large, 797.)

In pursuance of this resolution, President Jones, of Texas, called a delegate convention of sixty-one members, who met July 4, 1845; ratified the proposition made by congress; prepared a constitution for Texas as a state in the Union, and submitted the same to the people of Texas, who approved it. In December following, a joint resolution was adopted by congress as follows:

"*Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the state of Texas shall be one, and is hereby declared one, of the United States of America, and admitted into the Union on an equal footing with the original states in all respects whatsoever."

It will be observed that the proceedings admitting Texas into the Union were somewhat similar, although not as full, comprehensive, and complete, as the act admitting Nebraska.

Under the act admitting Texas the inhabitants of Texas, after the declaration of independence, became at once citizens of the United States.

In *Cryer v. Andrews,* 11 Tex., 183, the supreme court of Texas says: "When the congress of the United States, under the authority to admit new states, receives a foreign nation into the confederacy, the laws of these respective nations, in relation to the naturalization of individual emigrants, have no application to the respective citizens of

each. By the very act of Union, the citizens of each become citizens of the government or governments formed by this Union. The position which has been sometimes broached, that the citizens of Texas must submit to the laws of naturalization before they can become citizens of the United States, is quite preposterous. No such doctrine was ever admitted or applied to the citizens or inhabitants of Louisiana or Florida—countries acquired by purchase. (2 Martin, 158 ; 3 Id., 733.) Much less is it applicable to the citizens of a state, which by voluntary treaty or legislation becomes incorporated into the United States. And if the citizens of Texas cannot be deprived of their franchise as citizens of the United States, neither can citizens of the latter be stripped of the immunities and privileges pertaining to the citizens of this state."

In *Barrett v. Kelly*, 31 Tex., 481, the question was again before the supreme court of that state, and it is said when the annexation to the United States took place in 1845, we became a part and parcel of the United States, and none of the citizens of the United States were aliens to Texas, and the citizens of Texas would be in their own country from the St. Lawrence to the Gulf of Mexico. Other cases sustaining the same views can be found, but by reason of the great length to which this opinion has been extended must be omitted. In effect, the union of the nine original states nationalized them, which is but another name for naturalization, and when the act for the admission of a new state authorizes the "inhabitants" thereof or "people" therein to form a state government, and the new state so formed is "admitted into the Union on an equal footing with the original states in all respects whatsoever," the conditions are precisely the same as those on which the original nine formed the Union, and the other members of the original thirteen came into the Union.

Had Nebraska been one of the original nine states every inhabitant of the state would, by the union, have become

a citizen of the United States.    It was "admitted into the Union upon an equal footing with the original states in all respects whatsoever."    Broader or more comprehensive language could not be used, and its meaning cannot be restricted without doing violence to the words employed.

In the third article of the treaty of Paris of April 30, 1803, by which the territory of Louisiana was acquired, it is provided: "The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess."    This stipulation could not have been intended to be restricted to the comparatively small number of inhabitants then occupying the territory which now forms the state of Louisiana, as the land ceded was an empire in extent, and has since formed a very large number of states.    The stipulation, therefore, was, in effect, that on the admission of each state into the Union all the *bona fide* inhabitants therein should thereupon be entitled to enjoy "all the rights, advantages, and immunities of citizens of the United States."

The admission of a state into the Union partakes of the nature of a treaty with the inhabitants that, in consideration of their forming a state government, they shall enjoy certain rights, privileges, and immunities.    It may be said to be to some extent a joinder of the law-making and treaty-making powers of the government.    Both parties derive benefit from the accession of the new state, and it is a matter of public history that congress has been exceedingly liberal in the benefits conferred upon the new states of the nation.    Congress may, no doubt, impose other conditions upon the inhabitants of a state seeking admission into the Union, but it is sufficient to say that it has not done so in this case.

It is contended on behalf of the attorneys for the relator that, because no cases can be found sustaining their view of the law except the Alabama one, therefore, the question has never arisen, or, if so, been decided adversely to the defendant. In this, however, they are mistaken. The Louisiana cases which were decided in the early history of the goverment, one of them by a judge of the United States court, have been followed apparently without question, and are cited with approval by the attorney general of the United States. But in this case it is not necessary to go to the extent of the cases cited.

The answer alleges that Joseph Boyd, the father of the defendant, in the year 1849, and long prior to the time that the defendant reached his majority, declared his intention to become a citizen of the United States. Had he resided in this state at the time of the adoption of the first constitution he would have been a legal voter therein and expressly authorized by the enabling act to vote for any officer to be elected by the state of Nebraska. The maxim of the law is, "*partus sequuntum patrem;*" that is, "the children follow the condition of their father." (Webster on Citizenship, 133.) This is the rule in regard to freemen, although a different rule exists in the case of animals and slaves. (1 Bouv. Institute, note 167, 502; 2 Bouv. Law Dict., 147.) The son, therefore, was in the same condition when he became of age, as his father, and was a citizen of the territory of Nebraska. Congress passed an enabling act for the territory to admit a certain portion of it as a state, should the inhabitants be so inclined. In effect, congress said to the future state, that in addition to representation in the senate, and a member having full power in the house, "We'll donate to you seventy-two sections of land for a university; two sections in each township for the support of common schools; twenty sections of land for the erection of public buildings at the capital of the state; all salt springs within the state, not

exceeding twelve in number, with six sections of land adjoining ; and five per cent of the proceeds of the sale of all public lands lying within the state after deducting the expenses incident to the same." There was also an appropriation to pay the expenses of the convention. Similar offers have been made to all other states except Texas.

It has never been the policy of congress to force a territory to accept a state government. In all cases the admission of the state has been on the voluntary application and consent of the people of such state. Judging the future by the past, the people of a territory might preserve their territorial character to the end of time and there would be no attempt on the part of the United States to coerce them into the Union.

The enabling act admitting a state is in the nature of a treaty with the inhabitants of such state. Now in the case of Texas there was no treaty. The language of the act of March 1, 1845, for the admission of Texas is : "Congress doth consent that the territory properly included within and rightfully belonging to the republic of Texas may be erected into a new state to be called the state of Texas, with a republican form of government, to be adopted by the people of said republic by deputies in convention assembled, with the consent of the existing government, in order that the same may be admitted as one of the states of this Union." Then follows certain conditions which were accepted by the state of Texas. All white inhabitants of the state of Texas at the time of its declaration of independence were held to be citizens of that republic, and this by the mere force of the declaration of independence. Now if a citizen of Texas, by the mere admission of that state into the Union, became, *ipso facto*, a citizen of the United States, why does not the same rule apply on the admission of a territory?

It may be said that a foreign state occupies a different position from that of territory belonging to the United

States. If so, however, the difference would seem to be in favor of the inhabitants of the territory. They have grown up under the fostering care of the government and their sentiments and sympathies favorable and friendly to it. This is illustrated by the very large number of volunteers that were furnished by every western state. In case of the admission of a state like Texas, containing a considerable mixed and Mexican population, there could not be from the nature of the case the same loyalty to the general government as in the people of the territories. In reason, therefore, every citizen of the territory when it was admitted into the Union became, *ipso facto*, a citizen of the United States. In the one case the enabling act is addressed to the state, and in the other to people of the territory. The propositions are the same in substance in both, and the result of the acceptance of the proposition the same in both cases, viz., admission as a state upon an equal footing with the original states. Suppose the United States should propose to the people of Manitoba to be admitted as a state and they should accept the proposition and thereupon be admitted as a state of the Union on an equal footing with the original states, would not every citizen of that colony thereby become a citizen of the United States?

The international law as understood in England has never been adopted in this country. In 2 Opinions of the Attorneys General, 356, it is said: "We take our knowledge of international law not from the Municipal Code of England, but from natural reason and justice; from writers of known wisdom, and the practice of civilized nations."

In conclusion, I desire to call attention to the case of *Attorney General v. The City of Detroit*, 44 N. W. Rep., 388. Prior to the admission of Michigan into the Union considerable difficulty had arisen between that territory and the state of Ohio in regard to the northern boundary of Ohio and the southern boundary of the territory of

Michigan.  The militia seems to have been called out on both sides, although wiser counsels prevailed and there were no actual hostilities.  Michigan, however, did not avail itself of the enabling act which was thought to favor the state of Ohio by giving it the disputed territory, hence no attempt was made to organize under the enabling act, but the legislature of the territory passed an act in pursuance of which a constitution was adopted, senators elected, and a representative in congress.  One of the provisions of this constitution was, that each male inhabitant residing in the state on the 24th day of June, 1835, should be entitled to vote at such election.  In the case cited it was held that a registration act which failed to provide for this class of voters was unconstitutional and void.  In the examination of the debates relating to the admission of that state the boundary question seems to have been a prominent feature and absorbed the attention of the members more particularly from Ohio and Indiana, some of whom claimed the state was attempting to break into the Union. There is considerable discussion in regard to the provision of the constitution above referred to, but it seemed to have been generally acquiesced in and the bill finally passed both houses by a very large majority.

The writer has spent considerable time in the consideration of the case and has examined every case *pro* and *con* bearing upon the question, and is forced to the belief that the defendant is a citizen.  In any event the principal question presented by the answer—the one which controls this decision—is, in the opinion of the writer, a pure question of law arising under the laws of the United States, and must ultimately be determined by the United States supreme court, and the decision of this court is at the most but a step in the progress of the case.

This is not a political question.  There must be one place where a party can assert his rights, where no inquiry will be made as to his political opinions, where no extra-

neous matter will be permitted to intervene to his prejudice. That place is a court of justice. Here the rich and poor, high and low, stand upon an equality, and the court looks not at the litigant but to his rights as shown by the record, and fearlessly declares the law.

In my view the answer states a complete defense to the action.

I have not discussed the rights of the relator to bring the action, as the case has not yet reached a stage where such discussion is necessary. When that point is reached, I will make a full examination of the law in relation thereto, and if, after such examination, the relator's right to the office should be clear, my duty to render judgment in his favor will be cheerfully performed.

[FILED FEBRUARY 17, 1892.]

MAXWELL, CH. J., dissenting.

This case was submitted to this court on a demurrer to the answer of the defendant. The question involved in that answer related entirely to the citizenship of the defendant, and upon the demurrer being sustained, the defendant had the right to amend his answer if he so desired. Sec. 146 of the Code provides, "If the demurrer be sustained, the adverse party may amend, if the defect can be remedied, by way of amendment, with or without costs, as the court in its discretion shall direct." The answer was clearly amendable, and the right to amend in such cases has always, so far as I am aware, been sustained. When I prepared my opinion in May last, I supposed that leave to amend would be given if desired, and therefore expressly say in that opinion that I had not examined the question as to the succession in case Boyd was removed. The question of the succession seemed to be of considerable importance, and as the court at the outset had made the order permitting the relator to institute the action so far condi-

tional, that it would permit the lieutenant governor to intervene if he saw fit to do so, it was but reasonable to suppose that in case the defendant was found not entitled to hold the office, the case would be set down for argument as to the proper person to succeed him, and that no conclusion would be reached until after such argument. When the majority opinion was filed, however, it appeared that my associates did not so understand the case, but proceeded to decide that the relator was entitled to the office.

The matter required time for proper examination, and as the principal question, viz., the citizenship of the defendant must be determined by the supreme court of the United States, I have deferred filing my views upon the questions indicated until that great tribunal had determined the main question, which it has now done in a manner creditable to the court. All questions relating to citizenship were authoritatively settled by that opinion, and need not be noticed here.

I think the majority of the court erred in holding that the relator had a right to continue in office.

Sec. 1, art. 5, of the constitution provides "That the the executive department shall consist of a governor, lieutenant governor, secretary of state, auditor of public accounts, treasurer, superintendent of public instruction, attorney general, and commissioner of public lands and buildings, who shall each hold his office for the term of two years from the first Thursday and (after) the first Tuesday in January next after his election, and until his successor is elected and qualified; *Provided, however*, That the first election of said officers shall be held on the Tuesday succeeding the first Monday in November, 1876, and each succeeding election shall be held at the same relative time in each even year thereafter. The governor, secretary of state, auditor of public accounts, and treasurer shall reside at the seat of government during their terms of office, and keep the public records, books, and papers there, and shall perform such duties as may be required by law."

Sec. 2 provides "That no person shall be eligible to the office of governor or lieutenant governor who shall not have attained the age of thirty years, and been for two years next preceding his election a citizen of the United States and of ·this state. None of the officers of the executive department shall be eligible to any other state office during the period for which they shall have been elected."

We are told in the majority opinion: "The inquiry is not whether he (Boyd) received a plurality of votes, but did he have the qualifications to be elected? * * * Elected, as used in the constitution, means the choosing of a person eligible to be chosen." This language, if I understand it correctly, means that the voters of the state may every one cast their votes for an individual for the office of governor, and the person so chosen may take the oath and give the bond required by law and enter upon the duties of the office, yet the incumbent may set himself up as judge, jury, and beneficiary in the case, and for some alleged cause refuse to surrender the office to the person lawfully chosen by the electors of the state. He may not only do this, but fill his apartments with armed men to assert his alleged rights in the premises in defiance of the will of the people, and thus bring reproach upon republican institutions. If the governor whose term has expired may still continue in office after the expiration of his term when another has been elected to succeed him, and keep the person elected out of the office, then every other officer in the state may do the same. If this is established as sound law, it will be found to be far-reaching in its scope. If it is a proper rule to apply in the construction of a state constitution, it will be found equally applicable when applied to the constitution of the United States, and thus become settled law that the incumbent in an office may retain the same, notwithstanding another has been chosen to fill the place and has qualified and accepted the position. It is a startling doctrine. There are times in the history

of the nation and state when, from a conjunction of circumstances, such a rule might be used to defeat the popular will, if not create anarchy and the destruction of free government. At common law, in many cases, an office was regarded as in the nature of a freehold, and hence that there was an implied right to hold over, unless it was otherwise provided. (*Rex v. Doncaster*, 2 Ld. Raymond, 1564; *Foot v. Prowse*, 1 Str., 625.) In this country, however, a public office is not considered as a freehold, and as against the public, the officer has no property in the office. Officers are elected or appointed for definite terms, and to guard against lapses—periods when there would be no officer to discharge the duties, and thereby the public suffer —there is a provision that the officer shall hold until his successor is elected and qualified. The provision is for the benefit of the public, not the officer. It is merely a lengthening out of the term to the commencement of that of the new incumbent. Then the term of the officer comes to an end. Another has been chosen in his place. If that person is disqualified, the law points out a plain and adequate remedy at the suit of the state conducted by the proper law officer, where the incumbent can be heard and his rights determined. A private citizen, not himself making any claim to an office by election or appointment, cannot institute proceedings in *quo warranto* against an officer, and an incumbent whose term has expired and is succeeded by another, is as to that office a mere private citizen and cannot maintain the action. It is very evident to my mind that the relator in this case has no right to act as such relator, and that he had no right to hold over his term. The only safety in a republican form of government is to carry out the will of the people. When there is a desire or determination to defeat that, pretexts—many of them specious and plausible—are never wanting, but it is the duty of every court as well as every patriot to frown upon all attempts to defeat the popular choice as declared through the ballot-box.

State, ex rel. Thayer,. v. Boyd.

Sec. 16, art. 5, of the constitution provides, "In case of the death, impeachment, and notice thereof to the accused, failure to qualify, resignation, absence from the state, or other disability of the governor, the powers, duties, and emoluments of the office for the residue of the term, or until the disability shall be removed, shall devolve upon the lieutenant governor." These provisions seem to cover every conceivable case. "In case of death, impeachment, and notice thereof to the accused, failure to qualify, resignation, absence from the state, or other disability of the governor, the lieutenant governor shall discharge the duties thereof." In the majority opinion we are told in effect that none of these provisions entitle the lieutenant governor to act. No cases are cited in support of this position, and after a pretty thorough search I am unable to find a single case that sustains the rule contended for.

Webster defines lieutenant governor as "an officer of state, being next in rank to the governor, and, in case of death or resignation of the latter, himself acting as governor. A deputy governor." (Am. Dict. [Ed. of 1881], 771.) The word "lieu" is derived from the latin word *locus*, and means place, room, stead. (Id.) In fact he is deputy governor. He is elected at the same time that the governor is elected and for the same term of office. The constitution, after enumerating a number of cases, among others when the governor fails to qualify, declares that the lieutenant governor shall fill the place. Now if a person elected governor fails to qualify and accept the office, he does not become governor by the election. He at the most is governor elect. In such case there is a failure on the part of the electors to obtain the person they have chosen. In effect the election fails; but does the preceding governor hold over? The constitution says, in effect, that he shall hold the office until his successor is elected and qualified. The successor in such case, however, has failed to qualify, and the case would seem to be very much stronger on behalf

State, ex rel. Thayer, v. Boyd.

of the former incumbent than the case under consideration, yet in such case it is conceded that the lieutenant governor would become the governor of the state, and the term of the former incumbent would cease on the first Thursday after the first Tuesday in January, 1891.    In addition to this, the section of the constitution above quoted, after enumerating the cases named, declares that in case of *any other disability* of the governor the lieutenant governor shall act as governor.    In the majority opinion it is said, in effect, that these words do not mean what they say; that they do not mean *any* disability not previously designated.    The reason why they fail to do so is not stated. From the reading of the section it is evident that the intention was to include *all* disabilities by reason of which the person elected should fail or cease to act as governor. That is the plain, natural import of the words, and no court is justified, either in law or reason, to adopt a forced construction.    As well contend that the word " white" means " black " as that the word "disability," in the connection in which it is used in the section above quoted, does not cover all disabilities.    A forced and unnatural construction of language, either in a constitution, statute, contract, or other instrument, is liable to be fraught with wrong and injustice, and leaves uncertain what view may be taken by the court of any instrument or document, and hence tends to unsettle and render precarious the law upon the plainest proposition, and therefore that mode of construction is generally discarded by the courts.    In addition to what has been said as to the right of the lieutenant governor to succeed the governor, it will be noticed that there is no provision in case of vacancy for electing a governor at the next general election after the vacancy occurs.    Hence if the position of the majority of the court is right, a man who did not receive a single vote for the office may hold the office of governor of the state for two years at least, and as much longer as possible; and thus government of the

49

people by the people be defeated, and the first step taken to Mexicanize the government of the state.

There are other reasons which might be given; among others, the statement of the relator in one of his applications to this court to file his relation, that he had been forced by the defendant to abandon the office; in other words, that he had vacated the office under duress. This is an affirmative plea and is repeated in the answer of the defendant to this extent. It is charged that he abandoned the office, and the two together make it certain that this took place soon after the defendant took possession of the office. If the relator voluntarily vacated the office even for a moment, the tenure would thereby be severed and no after acts would heal the breach. If he was forced out under duress, the proof is on him to show such duress. The plea, as I understand it, admits the breaking of the tenure, but pleads a legal excuse therefor. No such excuse appears in the record, and the breach of the tenure, in my view, stands admitted.

In any view of the case, therefore, the relator ceased to be governor of this state on January 7, 1891, and since that time had no right to bring the action, or hold the office of governor.